UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHEMEEKA C. DAVIS,

Petitioner,

v.

DEBORAH K. JOHNSON,

Respondent.

Case No. 15-cv-05760-HSG

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 20

Pending before the Court is Petitioner Shemeeka C. Davis's second amended petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254, challenging the validity of a conviction obtained against her in state court. Dkt. No. 20 ("Pet."). Respondent Deborah K. Johnson, Warden, filed an answer, Dkt. No. 23 ("Ans."), and Petitioner filed a traverse, Dkt. No. 31 ("Trav."). For the following reasons, the Court **DENIES** the petition.

## I.    PROCEDURAL HISTORY

On July 6, 2010, the Contra Costa County District Attorney charged Petitioner by information with one count of murder (Cal. Penal Code § 187); two counts of torture (Cal. Penal Code § 206); and two counts of felony child abuse (Cal. Penal Code § 270a(a)). Pet. at 2. Petitioner pled not guilty on July 19, 2010, and pled not guilty by reason of insanity on March 4, 2011. *Id.*

On June 7, 2011, a jury returned a verdict of guilty on all counts and found the murder to be of the first degree. *Id.* Following the sanity phase of the trial, the jury found Petitioner sane. *Id.*

On January 6, 2012, the trial court sentenced Petitioner to 32 years to life in prison. *Id.*

Petitioner appealed her conviction to the California Court of Appeal, First District. On July 9, 2014, the court affirmed Petitioner's convictions in an unpublished opinion. *See* Pet. Exh.

A.  Petitioner sought review from the Supreme Court, but her petition was denied without comment on October 1, 2014.  *See* Ans. Exhs. 9 (petition), 10 (denial of review).

On August 18, 2014, proceeding *pro se*, Petitioner filed in this Court a petition for a writ of habeas corpus.  *See* Dkt. No. 1.  On May 17, 2016, the Court appointed an attorney to represent Petitioner in her federal habeas challenge.  *See* Dkt. No. 14.  Counsel filed a first amended petition for a writ of habeas corpus on behalf of Petitioner on July 26.  *See* Dkt. No. 17.

Following the Supreme Court's decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015) and *Welch v. United States*, 136 S. Ct. 1257 (2016), Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court on July 13, 2016, asserting that she was entitled to relief under those decisions.  *See* Pet. Exh. C.  The California Supreme Court denied the petition without comment on September 14, 2016.  *See id.*

On September 15, 2016, Petitioner moved for leave to file a second amended petition for a writ of habeas corpus.  *See* Dkt. Nos. 20, 21.  The Court granted Petitioner's motion on October 14.  *See* Dkt. No. 22.

## II.    STATEMENT OF FACTS

The following background facts describing the evidence presented at trial are from the opinion of the California Court of Appeal:[1]

### Prosecution Case

Shortly after 3:15 p.m. on September 2, 2008, Antioch Police Officer Trevor Schnitzius was dispatched to a medical emergency at a residence in Antioch. Family members, including appellant, directed the officer to a room upstairs, where he found the body of 15–year–old Jazzmin D. [FN 2] Her naked body was extremely emaciated and covered with open sores and scars. The body was also cold, and rigor mortis had begun in the extremities.

> [FN 2] The other part of the wooden dowel or closet rod was found in the upstairs hall closet.

That same day, police officers obtained a search warrant and, over several days,

---

[1] The Court has independently reviewed the record as required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2014), unless otherwise indicated in this order.

executed it at appellant's house. The rooms on the second floor of the house included a bathroom; a bedroom Jazzmin shared with her brother J.D.; the bedroom of appellant's young daughter J.T.; and the master bedroom, where appellant slept. Between Jazzmin's and J.T.'s rooms, there was also a small linen closet.

The entire second floor had a very strong putrid odor, consistent with the smell of blood, urine, and cleaning products. Jazzmin's bedroom had minimal furniture in it, including a bunk bed, a crate-type item that contained only boys' clothes, a TV stand and small television, and a fan. Jazzmin's body had many fresh, open wounds on it. No blood was dripping from the wounds, although there was a bandage made from a piece of a bed sheet wrapped around her knee. There was no blood on the carpet around her, but the carpet was wet, smelled like a cleaning product, and appeared to have been recently shampooed. The carpet under Jazzmin's body was wet and scented and, except for one small stain, appeared clean. When the carpet was pulled up, however, there was blood on the bottom that had soaked through from the top of the carpet. There were dripping lines of clear liquid running down the walls, and it appeared that the walls had been wiped down. But there were still hundreds of very small blood spots all over the walls, ceiling, and furniture, including the bed. There was powder sprinkled on the carpet in the hallway, near the wall and doorway into the bedroom. Police also found empty containers of carpet cleaner and a bottle of Spic 'n Span cleaner in the upstairs hallway. There were holes and patched holes in most of the upstairs rooms, along the stairway leading upstairs, and in the living room and laundry room on the first floor.

The smell of blood, urine, and cleaning products, as well as feces, was particularly strong in a small closet in Jazzmin's room. The closet contained nothing except for a shelf on a wall and a loose piece of carpet on the floor. The clothes rod had been removed from the closet. The closet's doorknob had been removed but, from marks on the door, it looked like, in addition to a deadbolt, some kind of securing device had previously been attached. Over 400 small bloodstains were found in the closet. Some were diluted, as if cleanup had been attempted. There were pieces of hair or biological matter in a few of the stains. There were also apparent bloodstains on the wood floor under the carpet. The bloodstains in the bedroom and the carpet appeared to have been deposited "over some course of time."

In the master bedroom, police found several crumpled plastic bags with wadded up clear packing tape stuck to them. The tape had what appeared to be blood and hair on it. Forensic testing subsequently matched the blood and hair to Jazzmin and a fingerprint on one of the bags to appellant. The hair had long, thick roots, which indicated that it had not fallen out naturally, but that some sort of force had been used.

Also in the master bedroom, police found a large trash bag that contained a blood and urine soaked mattress cover, blue jeans with blood on them, and bloody baby wipes. They also found a container with more bloody wipes in them, a deadbolt lock, an iron, part of a wooden dowel with the words "B ASS Stick" written on it in black marker; [FN 3] two pieces of stained carpet tack strip with clumps of hair on them, and several belts, including one with a bloody padlock tied to it, and another that appeared to have been configured into handcuff-type restraints.

> [FN 3] The other part of the wooden dowel or closet rod was found in the upstairs hall closet.

3

The master bedroom was filled with "massive amounts" of clothing, overflowing from the closet or neatly stacked, much of it new. There were hundreds of bottles of lotion from Bath & Body Works all over the room and 20 or more bottles of perfume. There was also an abundance of hair accessories and makeup. Finally, there was food and cases of soda throughout the master bedroom.

On the first floor, the kitchen pantry and refrigerator were well-stocked with food. The living room, dining room, and family room carpets were covered with sheets of plastic.

The pathologist who performed an autopsy on Jazzmin testified that the cause of death was severe malnutrition compounded by chronic injury. She was extremely underweight, her thymus and thyroid glands were abnormally small in size due to malnutrition, and her large intestine was smaller than her small intestine, which was very unusual and reflected that she had eaten little for weeks or months. She was 5 feet, 7–1/2 inches tall and weighed 78 pounds.

Jazzmin's body had hundreds of scars and open sores, in various stages of healing, all over her body, "pretty much from head to foot, front and back, arms and legs." The most profuse number of recent injuries were located on the top and left side of her head. The scars and injuries were of so many distinct stages of healing and irregular shapes that it appeared that Jazzmin had been struck by various objects over an extended period of months or years. A few of the injuries could have been inflicted within 12 hours of her death. Some wounds could have been pressure sores, caused by Jazzmin lying on her back and in other unusual positions for long periods. Several scars on Jazzmin's lower chest and abdomen appeared to have been burns from a clothes iron. Puncture holes on her scalp were consistent with her having been struck with a hard object with tacks protruding from it.

Based on the first responder's description of the state of Jazzmin's body, the pathologist believed she had been dead for about two hours when police first arrived at the house.

J.D., who was 18 years old at the time of trial, testified that, although appellant was his aunt, he only learned that she was not his real mother when he was close to 10 years old, and he still considered her his mother after that. He and his twin sister Jazzmin had always lived with appellant, who was their foster mother until she sought legal guardianship, shortly before Jazzmin's death. Other children, including appellant's two older sons and younger daughter, also grew up in the same house with J.D. and Jazzmin.

When J.D. and Jazzmin were eight or nine years old and they got in trouble, appellant began to "whup" them with belts, wooden spoons, and knotted electrical cords. He did not remember any whuppings before that age. Appellant also used a closet clothes rod or stick, primarily to hit Jazzmin. Appellant had written on the stick with black permanent marker, and she hit Jazzmin all over her body, until at one point, it broke during a beating. She also hit Jazzmin with a carpet tack strip and hit them both with a belt with a padlock attached to it. She would wrap the belt around her hand and hit them with the swinging padlock. Appellant used a chain with a different padlock to tie them up.

Shortly before Jazzmin's death, appellant hit her with a stick, which made a hole in her leg, and which appellant bandaged. After that, Jazzmin could not really walk

4

anymore, but she still had chores she had to do. When she had trouble doing the chores, appellant would beat her. Jazzmin would cry when she was being beaten. Appellant also burned J.D. once and Jazzmin more than once with an iron. J.D. acknowledged that, when he talked to police, there were burns on his body he did not even remember that he had.

In the year before September 2008, appellant whupped Jazzmin two or more times a week and whupped J.D. once or twice a week. The reason appellant gave for the beatings was that J.D. and Jazzmin were destroying her property. She accused them, and primarily Jazzmin, of this "all the time." J.D. never saw Jazzmin do any of the things of which she was accused. At some point, appellant started locking both twins in a closet. Even when appellant locked them in the closet, she would accuse Jazzmin of breaking out and destroying things, although Jazzmin could not have done anything because she had been in the closet the whole time. He and Jazzmin initially denied doing the things appellant accused them of, but she would keep beating them until they admitted doing what she said they had done.

In April or May 2008, appellant accused J.D. and Jazzmin of messing up her clothing and said she was going to do to them what they had done to her clothes. Appellant then burned J.D. on his body with an iron; when he jumped back and screamed, she said, "'Don't run because it will get worse.'" Appellant then sent J.D. into the closet while she burned Jazzmin. Appellant kept J.D. home from school for a while after the burning incident.

When asked how he felt about being punished this way, J.D. testified, "I just felt like I must have done something wrong. I didn't know exactly what it was, but I just thought I did something wrong." He did not feel like it was wrong for appellant to punish him in that way; he thought it was just how it was supposed to be.

Appellant never took them to a hospital for treatment after she injured them, although she would give them creams for their burns and cuts. J.D. had sickle-cell anemia, and was supposed to be going to the doctor for regular checkups. When he was younger, appellant did take him to the doctor and he also stayed in the hospital at times. Later, appellant would tell him, "you're lucky you have sickle-cell so I'm not going to hit you that bad," because she did not want to have to take him to the hospital.

In the year before Jazzmin died, appellant did not typically give them the same food she gave her other children. She would usually give them cereal in the morning and cup of noodles and frozen burritos later in the day. They would have to eat their food in the closet. They would get more food before the social worker's visits. Towards the end, Jazzmin would hallucinate and think she had eaten her food even though she had not.

The last school year before Jazzmin died, 2007 to 2008, J.D. was still going to school but Jazzmin was not. J.D. tried to bring food home from the cafeteria to give to Jazzmin, who would eat it. During that year, appellant started locking Jazzmin in the closet in their bedroom for a couple of weeks at a time. Before J.D. turned 15 in February 2008, appellant falsely accused him of letting Jazzmin out of the closet, so she began locking him inside also. When J.D. got home from school, she would lock him in the closet until the next day. Appellant also accused the twins of tampering with the lock while they were in the closet, but this was not true. Appellant used dead bolt locks and, when she thought they had tampered with one, she would get another.

5

To use the bathroom while they were locked in the closet, J.D. and Jazzmin would have to knock on the wall and wait for appellant to come and let them out. If she did not come, they would go the bathroom on themselves. Appellant would then accuse Jazzmin of doing it on purpose, and would beat her while making her clean it up. With J.D., appellant would say she knew he did not do it on purpose. Appellant sometimes left them in the closet for more than one day without letting them out to go to the bathroom. The closet originally had a light in it, but appellant took it out, saying they "were wasting her PG & E." There had been a rug on the closet floor, but appellant took that out too. Appellant allowed J.D. to have a pillow and blankets in the closet, but not Jazzmin. J.D. would share his blanket with Jazzmin. He also shared his clothes with her because Jazzmin did not have any.

J.D. noticed a pattern where, every time the social worker was going to come, appellant would make the twins clean the closet and put everything back inside. Also, in addition to giving them more food before the social worker visits, appellant would be nicer and apologize to them, saying she was not going to hit them anymore. She gave them clothing and makeup as well, to cover up their injuries, and sometimes took Jazzmin to the mall. Shortly before Jazzmin died, appellant was trying to get guardianship of them, and she said that after she became their guardian, the social worker would be gone. During the social worker visits, which took place every six months or so, the social worker would mostly talk to the twins downstairs. J.D. did not tell her what appellant was doing to them because he thought it was normal. He also feared that, if he told her what was going on and she did not take them away immediately, it would just get worse with appellant. J.D. heard appellant complaining to the social worker about Jazzmin's behavior, but he never heard her tell the social worker, neighbors, or her lawyer that she was afraid for her safety because of Jazzmin or J.D.

The summer before Jazzmin died, J.D. and Jazzmin were in the closet "for good." Once the 2008 to 2009 school year started, neither child was allowed to go back to school.

The day Jazzmin died, appellant accused her of "messing with the thermostat" while appellant was at work. They were in the twins' bedroom, and appellant started hitting Jazzmin, who was naked, as she often was. Appellant told J.D. to go downstairs and get some trash bags and hot water. Appellant had previously thrown hot water on them and put trash bags over their heads. She would "just basically torture us" by pulling the bag tight until they could not breathe before ripping it off.

When J.D. brought the bags and a tea kettle full of hot water up to the bedroom, appellant complained that the water was not hot enough, but she still threw the water on Jazzmin. J.D. had felt the water and it was hot. Appellant then wrapped Jazzmin in a blanket and made her stand in one trash bag and put the other one over her head. As she continued to hit Jazzmin, she told J.D. to go take a shower, which he did. As he left the room, Jazzmin was still alive and was talking, although he did not hear what she said.

J.D. was in the bathroom for about 30 minutes. When he turned off the water in the shower, he heard appellant screaming his name. He ran into the bedroom and appellant, who was crying, said there was something wrong with Jazzmin. Jazzmin was lying on the floor in their room and appellant was performing CPR on her.

Appellant asked J.D. to help her get the bags off of Jazzmin. J.D. tried to touch Jazzmin, but appellant would not let him. Appellant had him get some ice, which she put on Jazzmin's chest. J.D. asked appellant if she was going to call the police, but she just cried and said, "there's only one thing I can do to make this right.... I have to kill myself." She also said, "'Why did you guys have to do this to me? Why did I have to do this to you guys? I'm so sorry,'" and "'I'll never do it again, just don't die, don't die.'"

Appellant then called her mother, who came to the house. Appellant's mother washed clothes and picked things up to throw away, including a teakettle, some blankets, and a bag with clothes in it. Appellant said they should put clothes on Jazzmin. She also asked her mother to wait to call the police until she had finished changing her clothes and putting on makeup. But her mother said, "you have to call the police now. You can't just leave her laying here." At some point, appellant's mother called the police and the police arrived at the house.

J.D. talked with the police after they arrived, but he did not tell them everything because he was afraid of what would happen if he told the truth. For example, he said that a burn on his arm came from a barbecue grill when it actually came from an iron. Subsequently, in 2010, J.D. spoke to a police officer and told her the truth about what had happened.

J.D. testified that he loved appellant and, even after Jazzmin's death, still loved her.

On cross-examination, J.D. testified that shortly after appellant's daughter J.T. was born, when he and Jazzmin were nine or ten, they found out that appellant was not their biological mother. This news seemed to upset Jazzmin and she started getting into more trouble at home and at school. Appellant began accusing Jazzmin of doing things, such as stretching out J.T.'s clothes, ruining everyone's clothes, putting chemicals or poisons in appellant's lotion bottles, cutting J.T.'s hair, stealing money, wiping her feces on walls in various parts of the house, and damaging the kitchen sink and appellant's car, even though Jazzmin was locked in the closet at the times of the supposed misdeeds. Appellant also accused Jazzmin of flushing cash down the toilet, stealing jewelry, messing with things in appellant's room, and punching holes in the walls of the house. She accused both twins of picking the lock on the closet door and escaping. They would admit to having escaped, even though they had not, to avoid punishment. Appellant also placed a baby monitor in the twins' bedroom.

Appellant got angry at Jazzmin, who had intense body odor, for not bathing enough. Jazzmin stopped wearing clothes when she was around 15 years old, after appellant took them away from her. After appellant accused Jazzmin of peeing on things in the house, J.D. heard Jazzmin say, "'I just wanted the house to stink so you guys would have to smell it.'" J.D. also testified that, at a certain point, Jazzmin stopped crying or acting as if it affected her when appellant beat her. This lack of reaction seemed to upset appellant.

Linda Ware, appellant's maternal aunt and the sister of appellant's mother, Irma Gamble, testified that, early in the afternoon of September 2, 2008, she came home and found some voice mail messages from her sister, Irma. Irma sounded very upset, like she was crying.

Ashley L., who attended Antioch Middle School during the 2006 to 2007 school year, testified that she went to school that year with J.D. and Jazzmin. Jazzmin often wore

long-sleeved shirts and Ashley once saw her with bruises on her arm and a cut on her head. Ashley also saw her with her arm in a sling. Jazzmin was very thin and Ashley and some friends sometimes offered to get J.D. and Jazzmin food from the snack bar at school. The twins would always take the food that was offered. Ashley did not see Jazzmin at school at all during the 2007 to 2008 school year.

Gloria Dodson was a neighbor of appellant's who lived on the same street in Antioch until moving away in March 2008. Dodson testified that she used to see Jazzmin going in and out of the house, but starting in about March 2007, she never saw Jazzmin at all. Appellant had previously told Dodson that Jazzmin and J.D. were not outside much because they were "bookworms." During the summer of 2007, Dodson asked appellant where her oldest daughter was, and appellant said that Jazzmin was her niece, that she had "'a smart mouth and attitude,'" and that she "'was living with a relative.'"

Dr. James Crawford, medical director of the Center for Child Protection at Oakland Children's Hospital, testified as an expert in pediatrics, including the forensic examination of child abuse and neglect. Two days after Jazzmin died, on September 4, 2008, Crawford examined J.D. His body was covered with scars of various patterns and burn marks, which were consistent with him being "literally struck all over his body" with various items and being "burned in a lot of places" by an iron. J.D. was also malnourished and pathologically underweight. He weighed only 90 pounds, which was 20 to 25 pounds less than he should have weighed, given his height and age.

J.D.'s medical records reflected that he was diagnosed with sickle-cell anemia when he was an infant. As a youngster, J.D. came to the hospital for checkups and was also admitted to the hospital four times between 1993 and 1996 due to pain crises. Until 2001, when J.D. was eight years old, he attended all of his medical appointments. Thereafter, he began missing more and more of his appointments, until 2005, when he stopped coming to the hospital at all.

**Defense Case**

Appellant's son, A.T., who was 20 years old at the time of trial, testified that, until September 2008, he lived in the Antioch home with appellant, his brother Michael and sister J.T., Jazzmin, J.D., and his stepfather, Jackie T. A lot of tension developed between appellant and the twins because Jazzmin and J.D. did not listen to appellant when she gave them orders to do things, such as clean up. Appellant also described things they did, like making holes in the wall in the stairway, damaging the air conditioner and the fireplace in appellant's bedroom, and keeping their bedroom a mess. In particular, "the closet Jazzmin was staying in, it was a mess. It was dirty. It smelled nasty." Appellant complained to A.T. that Jazzmin was tampering with her and J.T.'s body products. He often saw appellant checking her soaps and lotions for contaminants. Appellant also complained that Jazzmin was stretching out J.T.'s clothes and rubbing feces and menstrual blood into them. Appellant said Jazzmin was stretching out the rest of the family's clothes as well. He never saw Jazzmin or J.D. do anything to anyone's clothing. Appellant also said Jazzmin had done something to mess up her car.

Appellant put an ironing board behind her door when she went to sleep, and also tied electrical cords between the twins' bedroom, the bathroom, and her bedroom so they

8

could not get out of their room. She put "booby traps," such as baby lotion or bells, inside her bedroom door, to see if anyone had been in her room. Appellant put a baby monitor in the twins' bedroom whenever Jazzmin was in the closet, and kept the other part of the monitor with her wherever she was.

On cross-examination, A.T. acknowledged that, when he spoke to police on the night of Jazzmin's death, he did not mention that appellant had put "booby traps" on her door, that she checked her and J.T.'s lotions for tampering, or that she believed Jazzmin or J.D. had done anything to try to hurt anyone in the family. Instead, he said that appellant would get upset with them for not cleaning their room and not taking showers, and that she would punish them with "'a whupping.'" A.T. was mostly downstairs when appellant whupped the twins, so he rarely saw the whuppings hapPenal But he did hear them, and they sometimes lasted for 15 or 20 minutes.

Over the two- or three-year period before Jazzmin died, A.T. noticed a change in appellant. She seemed to stop caring about herself as much and seemed really depressed and sad all the time. She stayed locked in her bedroom a lot and focused her attention on Jazzmin and J.D. more than on the other children. A.T. stayed away from home as much as he could, to be away from "all the problems that were in the house."

Appellant's first cousins, Rosalind Lazarte and Anthony Stingley, testified that they had known appellant since she was a child and described the challenges she faced growing up. As a child, appellant seemed withdrawn, anxious, and sometimes hostile. She initially lived with her mother, Irma Gamble, but Irma was a heroin addict and sometimes locked her children out of the house. At some point, appellant went to live with her grandmother, Martha Gamble, because of her mother's drug use and because she was not getting proper care. At her grandmother's house, appellant's clothes and toys were kept in a locked room because appellant's mother had tried to steal them to sell for drug money. Appellant was "very guarded" with her belongings, "always accusing people of touching or moving or messing with her stuff." Both appellant's mother and grandmother kept their houses immaculately clean and, as an adult, appellant did the same. Her grandmother would discipline her by hitting her with a switch. Appellant's father was killed when appellant was about seven years old. At some point, as a preteen, appellant stopped communicating for a time.

Appellant's cousins described the father of appellant's two sons, as controlling and bossy with appellant. Stingley saw appellant with a black eye and bruises while she was with him. They broke up about a year after their younger son, A.T., was born.

For some months before Lazarte's wedding in March 2008, she and appellant spoke on the phone regularly. Appellant told Lazarte that she was overwhelmed and worried because Jazzmin was doing dangerous things, such as putting urine and chemicals into her and J.T.'s food and drink. At one point, appellant told Lazarte that she thought she was going crazy. Stingley last saw appellant a year or so before Jazzmin died, and appellant did not say, then or earlier, that she was afraid of Jazzmin or J.D.

Three experts testified for the defense, one regarding Jazzmin's psychological and behavioral issues and two regarding appellant's mental illness.

Dr. Andrew Pojman, a clinical and forensic psychologist, testified as an expert in the field of psychology. Dr. Pojman reviewed many records related to the case, including social service, therapy, and medical reports and school records, and concluded that

9

Jazzmin suffered from attention deficit hyperactivity disorder (ADHD) and conduct disorder. There was evidence of hyperactivity from the time she was four years old. She had a pattern of "not being able to focus, intruding, causing behavior difficulties" that existed throughout her years at school, including 54 instances of being disciplined for her behavior. At age seven, Jazzmin tested in the 98th percentile for hyperactivity and in the 99th percentile for conduct disorder.

Jazzmin apparently met with an intern at a family therapy center for some months in 2004. The intern's notes reflected that Jazzmin told her that "she likes to do things she's not supposed to do" because she either "just wants to" or "to get back" at appellant. There were also notes about Jazzmin putting on her sister's underwear and shredding them, as well as problems with her personal hygiene. Dr. Pojman testified that having a child with ADHD can be very challenging for a parent, especially if that parent has his or her own psychological problems.

Dr. Karen Franklin, a clinical and forensic psychologist, testified as an expert in the field of forensic psychology. She conducted an evaluation of appellant, meeting with her over four days during a month-long period and reviewing thousands of pages of records in the case. Dr. Franklin diagnosed appellant with borderline personality disorder, obsessive-compulsive disorder, major depression, and delusional disorder.

Dr. Franklin based her diagnosis of borderline personality disorder on evidence of appellant's binge-spending and binge-eating; her recurrent suicidality; her mood swings, anger, difficulty controlling her temper, and lack of predictability; stress-induced paranoia; and dissociating. Dr. Franklin based the diagnosis of obsessive-compulsive disorder on appellant's frequent washing of herself and her home, her irresistible urge to check that everything was okay, her need to put things in order, and her hoarding of things, such as body lotions and perfumes. The diagnosis of major depressive disorder was based on a prior depression diagnosis in about 2000 and appellant's feelings of hopelessness, helplessness, fatigue, insomnia, and mounting stress.

The diagnosis of delusional disorder was based on the fact that appellant "had a whole set of beliefs about Jazzmin that were clearly not factual—fact-based—." Appellant believed that Jazzmin "had some evil intention toward her and toward her youngest daughter J.T. and specifically that she was trying to poison them...." Appellant believed that "Jazzmin would sneak around the house and contaminate things, contaminate medicines," as well as engage in other tampering behaviors related to urine and feces. Appellant had an "obsessive, overpowering belief that ... Jazzmin's main goal in life is to tamper with her things and that she has to try to catch her."

Appellant's psychological problems were likely exacerbated by the severe mistreatment and neglect she had experienced as a child; J.D.'s and, particularly, Jazzmin's physical and behavioral issues resulting from crack cocaine withdrawal as babies; and the lack of support she received as an adult from family, friends, or social services. Appellant's obsessions and depression worsened after the birth of J.T., who had a serious heart condition. Around that same time, under pressure from a social worker, appellant told Jazzmin and J.D., who had been with her since they were three months old, that she was not their mother. This news upset Jazzmin, whose acting out then became worse.

There was also evidence that appellant routinely smoked marijuana and had used methamphetamine. Dr. Franklin learned after she completed her evaluation that appellant had a positive toxicology report for methamphetamine when she was arrested. She did not believe appellant's condition was consistent with methamphetamine psychosis, but acknowledged that methamphetamine use can cause anger, impulsive behavior, mood swings, and paranoid states of mind. Dr. Franklin also acknowledged that there was nothing in the records of the agency monitoring the twins' placement with appellant that reflected any complaints from appellant that Jazzmin or J.D. was trying to poison or otherwise harm appellant or her children.

Dr. Martin Blinder, a forensic psychiatrist, testified as an expert in the field of psychiatry. He met with appellant twice, conducted psychometric testing on her, and reviewed many documents related to appellant and the case. He concluded that appellant was "a very emotionally fragile individual," who had numerous stressors in her life, especially Jazzmin, who was herself a very troubled child. Appellant's problems were exacerbated by her abusive and chaotic childhood. Dr. Blinder believed that appellant had a thought disorder with delusions that centered around Jazzmin being "somehow demonic." Appellant's "profoundly disturbed thoughts coupled with her ... increasing inability to control her emotions and find a constructive way of dealing with Jazzmin, led to the kind of brutal conduct that eventually led to Jazzmin's death." Someone with appellant's thought disorder could have done the various things appellant did to Jazzmin due to the mistaken belief that such a child is dangerous enough to harm that individual or another child.

Dr. Blinder did not believe appellant suffered from methamphetamine psychosis in that appellant's delusions were not triggered by methamphetamine use but by Jazzmin's own psychiatric problems, with which she could not cope. Finally, Dr. Blinder did not see anything in the social service reports reflecting that appellant had informed the social worker that Jazzmin was trying to poison anyone in the family.

**Prosecution Rebuttal**

Appellant's aunt, Linda Ware, testified that appellant had mentioned problems she had with Jazzmin, such as cutting J.T.'s hair or wearing and stretching out J.T.'s leggings, but Ware did not see any problems. Appellant never said anything about Jazzmin being dangerous.

Antioch Police Officer Michael Mortimer testified that he interviewed appellant's son, A.T., on the night of Jazzmin's death. A.T. initially said that appellant disciplined the children by taking away television privileges, but later acknowledged that Jazzmin and J.D. received additional punishment in the form of "whuppings," where appellant would hit them once or twice. A.T. said they deserved the physical punishments they received for such things as being unclean. He persisted in this opinion even after being told that Jazzmin may have died as a result of appellant's punishments. A.T. never said anything about the twins attempting to poison anyone in the house or putting chemicals in medicines or lotions.

Diana Christensen, a manager at San Francisco Child Protective Services (CPS), had reviewed CPS's records related to J.D. and Jazzmin. Appellant had been their foster parent until she became their legal guardian on August 27, 2008. Once a guardianship is established, CPS's responsibility for monitoring a case, including social worker visits, ends.

**Sanity Phase Evidence**

During the sanity phase of the trial, two of appellant's family members testified that appellant had behaved bizarrely during the final year of Jazzmin's life.

Jackie T., J.T.'s father, testified that he lived with appellant between 1995 and 2008, and was in a long-term relationship with her. He had a drug problem that led him to be away from the house for days at a time. Jackie testified about appellant's beliefs related to the twins' supposed stealing, poking holes in walls, urinating in the house, and sneaking into her room. He never saw the twins do any of these things, but he did hear them admit doing so to appellant. According to Jackie, when appellant kept the twins locked in the closet, she always made sure they had food to eat.

While appellant was normally a loving person, when she got angry, her face would go blank and she "wasn't herself." For example, in 2008, a day or two before Jazzmin's death, appellant was mad at Jackie because he had been gone for several days. She told him to leave because she did not want drugs in the house. Then while he was in his car trying to leave, appellant came at his car with a knife, which she used to slash several of his tires and to scratch the word "bitch" on top of the car.

Appellant physically disciplined Jazzmin and J.D., and Jackie would tell appellant she did not need to whup them that hard. Jackie also testified that Jazzmin told the social worker that she had been spanking the twins for urinating on the floors and picking holes in the walls, and the social worker said she would spank them too if they were doing that in her house. Appellant also "begged" for help from Jackie and from social workers because she was depressed and felt overwhelmed with the children, but no one helped her.

On cross-examination, Jackie admitted that he had lied to police during an interview on the night of Jazzmin's death because he had been on a drug binge, was still high, and was paranoid and scared. Because of this, he told police he had not seen Jazzmin in a year when, in fact, he had seen her a week before she died. He also said he had not seen appellant beating the twins, when in fact he had.

Appellant's son, A.T., testified that appellant would have him check the locks on the closet and also search inside for a key or anything else Jazzmin might have in there. He never found anything. A.T. had seen some of the whuppings appellant gave the twins and, in addition to a spoon and a belt, he saw her use an electrical cord on them.

Also during the sanity phase, appellant's two expert's, Dr. Franklin and Dr. Blinder, reiterated their guilt phase testimony that appellant was mentally ill and further opined that she was insane when she tortured both twins and murdered Jazzmin.

Dr. Franklin based her finding of insanity on her opinion that appellant's delusional belief system prevented her from knowing "the nature and quality of her act, and she didn't know that it was morally wrong." According to Dr. Franklin, appellant "genuinely," but wrongly, "believed that Jazzmin was doing a number of things to her and to her younger daughter J.T. that were harmful to her. And, in fact, that Jazzmin's primary goal in life was to wreak havoc and have a nightmare situation in her life and puts her and her younger daughter in danger."

Although J.D. was more difficult as a very young child due to the cocaine exposure both children experienced in utero, Jazzmin's behavior became much more challenging as she got older. Dr. Franklin believed that a diagnosis of oppositional

defiant disorder that Jazzmin received at age seven in 2000, shortly before J.T. was born, contributed to appellant's subsequent delusional belief system in that it affected her attitudes about Jazzmin as a bad, defiant child. In addition, the social worker's conclusions, for example in a 2003 report, that Jazzmin behaved badly at school because "she does not take school seriously," made it seem as if Jazzmin's problems stemmed from the fact that she did not want to be good, which also likely played into appellant's delusional belief system. For appellant, who came from a family where harsh physical discipline "is the number one line of defense for misbehaving children," she would naturally think that "if Jazzmin continues to be bad and negative at home and at school, and it's thought by [appellant] and the social worker and the doctor that it's just because of a negative character trait, then I think [appellant] felt if she could only discipline her better, Jazzmin would stop and the problem would go away."

Also playing into the dynamics of the case was the social worker's insistence, in 2004, that appellant tell the twins that she was not their real mother, after which Jazzmin became much more difficult to handle and care for. Jazzmin also became very jealous of J.T., who was three years old at that time, destroying and wearing her clothes. In 2006, Jazzmin, whom the social worker described in a report as "out of control," had some individual therapy, which apparently did not help much. Appellant reportedly told the social worker around that time that she was considering giving up the children because of the difficulties. Then, in 2008, when she applied for legal guardianship, the social worker's report reflected that appellant was still expressing concerns, but they were "not as critical" as they were earlier. From early on in the dependency proceedings, the records reflected "a repeated theme" that appellant "was begging and begging for help," such as respite assistance, from Child Protective Services, but no such assistance was ever offered.

Dr. Franklin explained that most women who kill their children are psychotic at the time, and she described appellant as an "organized psychotic" type: a mother who "is fairly functional, can parent, hold jobs, be in a relationship, things like that, but ultimately end[s] up falling apart under stress and becoming psychotic with the psychosis typically focusing on the particular child that ends up being killed." Appellant's preexisting mental disorders and extreme stress became cumulatively overwhelming and contributed to her psychosis. Dr. Franklin also believed that appellant dissociated while disciplining such that "she kind of lost herself in it" and did not really remember exactly what she was doing.

Dr. Franklin believed that appellant not only did not realize that what she was doing to Jazzmin was morally wrong, but she in fact "thought it was morally right" because she was defending herself and her family, as well as trying to save Jazzmin. Dr. Franklin acknowledged that, after her arrest, appellant was crying and blaming herself for what had happened; she kept repeating to police, "I was wrong." However, although appellant "had some awareness that what she was doing might [not be] the best course of action, ... she was not aware of the full extent of it, and she certainly didn't intend the result that happened. And when she realized what happened, she kind of came to her senses and felt horrible."

Appellant's other expert, Dr. Blinder, based his opinion that appellant was insane at the time of the offenses on appellant's delusional thinking and misinterpretations of Jazzmin's conduct, due to her significant mental disability. Jackie's testimony that,

when appellant hit the twins, she had a "blank stare," was significant to Dr. Blinder's finding of insanity in that it was "suggestive of dissociative episodes, that is, she's stepped outside herself and her basic person which is to be a loving, caring mother to these kids and now has become temporarily somebody else because of a short circuit ... in her mind." Her delusional thinking about Jazzmin and her level of stress caused her to dissociate. Dr. Blinder also testified that it was not unusual that appellant functioned normally in most areas of her life. He explained, "If you step outside her areas where she's mentally ill, she can function perfectly normally." The fact that she could work part-time did not change his opinion regarding her sanity.

Two other experts, Dr. Marlin Griffith and Dr. Paul Good, were appointed by the trial court in 2011 to evaluate appellant and determine whether she was sane. Both experts believed appellant was mentally ill, but also believed she had been sane when she committed the crimes.

Dr. Griffith, a clinical and forensic psychologist, testified as an expert in the field of forensic psychology, including the determination of sanity and insanity. Dr. Griffith met with appellant, conducted psychological testing, and reviewed various documents related to appellant and the case. He concluded that appellant had a chronic major depressive disorder and that she likely had an underlying personality disorder. He believed that Jazzmin was an acutely disturbed child and, at the time of the offenses, appellant was overwhelmed and lacked the resources to manage Jazzmin's behavior. He believed that appellant reverted back to the practices of her own upbringing in dealing with Jazzmin.

Dr. Griffith further believed that appellant became paranoid in her thinking and suffered from a delusional disorder, persecutory type. But he also believed that appellant was unconsciously exaggerating her psychotic symptoms due to her depression. He found that her statements to police and her psychological evaluations at the jail after her arrest indicated that, although she was quite depressed, she did not at that time present with a thought disorder, hallucinations, or delusions. Instead her mental state "was relatively lucid and clear." Dr. Griffith also believed that appellant was exaggerating her low intelligence.

Dr. Griffith opined that appellant was sane when she committed the offenses. He based this opinion on the statements appellant made after her arrest, in which she took responsibility for her actions, indicated that the punishment she inflicted on the twins was abusive, and detailed how she had abused them. That appellant concealed the extent of the abuse from everyone indicated to Dr. Griffith that she understood what she was doing was both legally and morally wrong. He further opined that, even if appellant's conduct was the result of delusions, with no malingering, she still understood both the nature and quality of her actions and the moral and legal wrongfulness of her actions. On cross-examination, Dr. Griffith acknowledged that appellant had told him that, although she now knew what she had done was wrong, at the time, she felt the punishment she inflicted on the twins was necessary and appropriate.

Dr. Good, a clinical and forensic psychologist, testified as an expert in the area of forensic psychology, including the determination of criminal insanity. In April 2011, the trial court appointed Dr. Good to conduct a psychological evaluation of appellant, related to the question of insanity. Dr. Good interviewed and administered

14

psychometric tests to appellant, met with the prosecutor and defense counsel, and reviewed documents relevant to the case, including the report of Dr. Franklin.

Based on the interviews, testing, and materials he reviewed, Dr. Good opined that appellant was sane at the time of the offenses in that she appreciated the nature and quality of her actions against Jazzmin and J.D. and knew, understood, and appreciated their legal and moral wrongfulness.

Dr. Good diagnosed appellant with various disorders, including major depression, obsessive-compulsive disorder, borderline personality disorder, and substance abuse disorders for marijuana and methamphetamine. Although appellant expressed some paranoia about Jazzmin, Dr. Good did not diagnose delusional disorder, partly because Jazzmin's behavioral issues reflected the reality of some of appellant's concerns. Moreover, even if he believed that appellant suffered from a delusional disorder, as Dr. Franklin did, that would not alter his opinion that appellant was sane at the time of her offenses because she still knew the nature and quality of her actions and understood that what she was doing was wrong. [FN 4] In light of her mental health issues, there would have been "some dissociation," but appellant did not describe going into a dissociative state in which she was not aware that she was beating the twins.

> [FN 4] On cross-examination, Dr. Good explained that, while appellant might have had moments when she would lose touch with reality, as part of her borderline personality disorder, she would then come back. He did not believe this was consistent with an ongoing delusional disorder.

Appellant had told Dr. Good that, at the times she was punishing Jazzmin, she was "very angry and upset with Jazzmin for Jazzmin's behavior at home. She perceived herself as disciplining the girl, but when I asked her about the whipping and the hitting, she acknowledged that she may have taken them too far." In particular, she said she recognized she may have gone too far with the whippings and using the closet rod. She did believe that locking the children in the closet was appropriate.

The fact that the abuse occurred over many months contributed to Dr. Good's finding of sanity in that he found it "hard to believe that in each and every one of the instances of abuse or torture that she did not know, at least at some point, that what she was doing was wrong." In addition, there were indications that appellant attempted to keep the abuse, the twins' injuries, and the emaciation of Jazzmin out of sight. For example, she told police that she had held back on telling her mother details about the abuse and there was evidence that members of the household were not aware of the full extent of what was occurring. J.D. also had described to police the actions appellant took to cover up the twins' injuries and buy them new clothes prior to the social worker's visits, and a neighbor had said appellant had told her Jazzmin had gone to live with another relative. Hence, "[e]ven in spite of her suspicions and her fears and her paranoia, she still retained a sense that this was wrong."

Also factoring into Dr. Good's sanity determination was appellant's actions at the time of Jazzmin's death showing she was aware that Jazzmin was in serious danger. Moreover, after her arrest, appellant responded to a detective's question regarding whether she had thought she would be arrested someday for abusing the children, with the statement, "'I figured—I mean, honestly, I would figure eventually, yeah, but I just don't know why I couldn't stop.'" Also, the fact that, following her arrest,

the mental health staff at the jail found no signs of psychosis was important evidence for Dr. Good's sanity finding, as was appellant's ability to understand and answer questions in a fairly cogent way and express that she felt bad about what had happened and knew what she did was wrong.

Finally, methamphetamine, for which appellant tested positive after her arrest, "is widely understood to increase the risk of violent behavior." Dr. Good did not believe appellant had methamphetamine psychosis, but did believe it was possible that methamphetamine she might have taken around the time of Jazzmin's death "may have been something that pushed her over the line." [FN 5]

> [FN 5] A criminalist testified that appellant tested positive for methamphetamine on the day Jazzmin died, which indicated that she had used methamphetamine within the previous two to four days.

On cross-examination, Dr. Good acknowledged that this was a "close case" with which he had struggled. He felt compassion for appellant but, in the final analysis, he felt confident in his opinion that her psychological problems were not severe enough to prevent her from knowing right from wrong.

Also on cross-examination, Dr. Good explained that appellant's IQ of 80 fell in the low-average range, which, combined with her depression, caused her to lose some ability to find alternative ways of dealing with Jazzmin. He also acknowledged that Jazzmin's many problems "would have tried the patience and the abilities of any parent" and was a very difficult child to raise. He testified that, at times, appellant's despair and borderline personality features led her to "act in rigid, angry, and psychotic ways." [FN 6] Appellant had told him that she thought Jazzmin was endangering her and J.T. in various ways. Dr. Good believed that appellant's actions were an attempt to punish Jazzmin to improve her behavior.

> [FN 6] Dr. Good noted that it is possible to be psychotic and still meet the criteria for sanity, since the legal and clinical criteria are different.

Dr. Good further acknowledged that appellant told him she had kept Jazzmin out of school to keep her from getting in more trouble. She also said she had brought Jazzmin food, but Jazzmin sometimes refused to eat as a way of defying appellant, who did not notice how thin Jazzmin had become. Dr. Good did not believe appellant was malingering during the psychological testing.

*People v. Davis*, No. A134565, 2014 WL 3353242, at *1–13 (Cal. Ct. App. July 9, 2014).

## III.     STANDARD OF REVIEW

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain such a petition "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). Because the California Supreme Court summarily denied Petitioner's state habeas petition, the California Court of Appeal, in its opinion on direct review,

1  was the only state court decision to address the claims Petitioner raises in the instant petition. The

2  Court thus reviews the decision of the Court of Appeal, the highest state court to have reviewed

3  the claims in a reasoned decision.

4  **IV.  DISCUSSION**

5  Petitioner asserts seven grounds for federal habeas relief: (1) there was insufficient

6  evidence of the required mental state to support her convictions for torture, Pet. at 24–31; (2) there

7  was insufficient evidence of the required mental state to support her conviction for first-degree

8  murder, Pet. at 31–32; (3) the term "for any sadistic purpose" in the torture statute was

9  unconstitutionally vague under *Johnson v. United States*, 135 S. Ct. 2551 (2015), Pet. at 32–34;

10  (4) the trial court refused to instruct the jury on voluntary manslaughter, Pet. at 34–36; (5) the

11  prosecutor misstated the law during closing argument, Pet. at 36–40; (6) the finding of sanity

12  violated due process because no rational trier of fact could have disregarded the compelling

13  evidence of insanity, Pet. at 41–46; and (7) her effective life without parole sentence was

14  unconstitutionally cruel and unusual, Pet. at 46–48. The Court addresses each claim in turn.

15  **A.  Insufficient Evidence for Torture**

16  Petitioner contends that her convictions for torture must be vacated because there was

17  insufficient evidence to support the verdicts. *See* Pet. at 24–31. More specifically, Petitioner

18  asserts that, given her mental illness and low intelligence, the California Court of Appeal

19  unreasonably found that she acted "for the purpose of revenge, extortion, persuasion, or for any

20  sadistic purpose." *See id.* at 26.

21  **i.  State Court Rejection of Claim**

22  The state court rejected Petitioner's claim as follows:

23  Appellant contends her two convictions for torture were not supported by substantial
   evidence and violated due process.

24
   "In reviewing a challenge to the sufficiency of evidence, the reviewing court must
25  determine from the entire record whether a reasonable trier of fact could have found
   that the prosecution sustained its burden of proof beyond a reasonable doubt. In
26  making this determination, the reviewing court must consider the evidence in a light
   most favorable to the judgment and presume the existence of every fact the trier could
27  reasonably deduce from the evidence in support of the judgment. The test is whether
   substantial evidence supports the decision, not whether the evidence proves guilt

28

18

beyond a reasonable doubt. [Citations.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 432, fn. omitted (*Mincey* ).)

Section 206 defines torture as follows: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury ... upon the person of another, is guilty of torture...." Torture under section 206 thus focuses on the mental state of the perpetrator, i.e., his or her specific intent to cause cruel or extreme pain for one of the listed purposes. (*People v. Massie* (2006) 142 Cal.App.4th 365, 370–371 (*Massie* ).) "In this respect, revenge, extortion, and persuasion are self explanatory. Sadistic purpose encompasses the common meaning, ' "the infliction of pain on another person for the purpose of experiencing pleasure." ' [Citation.] While sadistic pleasure is often sexual, the statute does not require a sexual element. [Citation.]" (*Id.* at p. 371.)

In arguing insufficiency of the evidence of torture, appellant cites *People v. Steger* (1976) 16 Cal.3d 539, 548 (*Steger* ), in which the evidence showed that the defendant had beaten her stepchild repeatedly due to frustration with the child's behavior, which ultimately caused the child's death. Our Supreme Court reduced the defendant's first degree torture murder conviction to second degree murder after concluding that there was no evidence showing that the defendant beat the child "with cold-blooded intent to inflict extreme and prolonged pain. Rather, the evidence introduced by the People paints defendant as a tormented woman, continually frustrated by her inability to control her stepchild's behavior. The beatings were a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a criminal sense willful, deliberate, or premeditated." The court further found the fact that the child had been injured on numerous occasions over a period of time "only supports the theory that several distinct 'explosions of violence' took place, as an attempt to discipline a child by corporal punishment generally involves beating her whenever she is deemed to misbehave." (*Id.* at pp. 548–549, fn. omitted.)

The high court emphasized that its conclusion was consistent with the literature on battered child syndrome, which involved "*uncontrolled* outbursts of frustration." (*Steger, supra,* 16 Cal.3d at p. 549, fn. 4.) The court did point out, however, that it was not implying by its holding "that a murder of a child can never be torture murder. In appropriate circumstances a child batterer can be found to be a torturer." (*Id.* at p. 549.)

In *People v. Walkey* (1986) 177 Cal.App.3d 268, 275–276 (*Walkey* ), the appellate court relied on *Steger* when it reduced a first degree murder conviction to second degree murder for a defendant who had beaten his cohabitant's child repeatedly over a period of several months. Evidence that the defendant resented taking care of the child and got upset when the child had toilet training accidents showed only that the defendant had become angry and engaged in "explosive violence" toward the child. (*Walkey,* at p. 276.) Such explosive violence, without more, dispelled any hypothesis that the defendant's "primary purpose was to cause [the child] to suffer." (*Ibid.*)

Appellant argues that *Steger* and *Walkey* require reversal of her convictions for torture because, as in those cases, the evidence here shows only that she beat Jazzmin and J.D. in a misguided attempt to discipline them, not with a "cold-blooded intent to inflict pain for personal gain or satisfaction." (*Steger, supra,* 16 Cal.3d at p. 546.) [FN

[FN 7] We observe that *Steger* and *Walkey* addressed the crime of first degree torture murder under section 189. That crime, unlike torture under section 206, requires "a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (*Steger, supra,* 16 Cal.3d at p. 546; see § 189.) "This is a critical point of distinction between section 206 and section 189, which *expressly* requires such intent for murder by torture because it is a kind of first degree murder. [Citations.]" (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1206; accord, *Massie, supra,* 142 Cal.App.4th at p. 372 ["An explosion of anger may be inconsistent with the reflection necessary for premeditation and deliberation, but it is not at all inconsistent with an intent to inflict cruel or extreme pain and suffering, which may be the result of 'mere unconsidered or rash impulse hastily executed' "].) Here, in her discussion of *Steger* and *Walkey,* appellant appears to incorrectly assume that the intent requirements for torture murder are also applicable to appellant's torture convictions. However, because we conclude that substantial evidence supports appellant's convictions of *both* the torture of Jazzmin and J.D. *and* the torture murder of Jazzmin (see text & Pt. II., *post* ), that distinction is less critical to our analysis than it would otherwise be.

After *Steger* and *Walkey,* however, our Supreme Court clarified that "[t]he death of a child may result from an explosion of violence, a misguided attempt at discipline, or torture, depending on the facts of the case. [Citation.] Just as child abuse can involve torture, a misguided attempt at discipline can involve an intent to cause cruel pain and suffering. There is no legal immunity from conviction for first degree torture murder because the victim happened to be a child." (*Mincey, supra,* 2 Cal.4th at p. 434.)

A number of California Supreme Court cases have affirmed verdicts of first degree murder in the context of child abuse and torture. In *Mincey, supra,* 2 Cal.4th at page 426, the defendant had beaten his girlfriend's children, resulting in the death of one child. The Supreme Court rejected the defendant's contention that the evidence was insufficient to establish every element of the crime of murder by torture. (*Id.* at p. 435.) As the court explained: "The length of time over which the beatings occurred, the number of injuries inflicted, the variety of objects with which the injuries were inflicted, and the fact that the victim was made to eat his own feces established planning and a preconceived design to inflict cruel pain and suffering." (*Ibid.*) The jury's finding of guilt of murder by torture was also supported by the testimony of one expert that, in his opinion, the defendant was aware of the harm he was inflicting on the child and intended to inflict the harm. (*Ibid.*) Although another expert testified that the defendant suffered from an intermittent explosive disorder, that same expert also opined that the episodes of loss of control of aggressive impulses might be of brief duration. (*Id.* at pp. 435–436.) There was also evidence that the defendant had below average intelligence. (*Id.* at p. 471.) The court concluded that, in all of the circumstances, "the jury could have reasonably found beyond a reasonable doubt that defendant's acts were premeditated and deliberate, involved a high probability of death, and were committed with the intent to cause cruel pain and suffering for a sadistic purpose." (*Id.* at p. 436.)

In *People v. Pensinger* (1991) 52 Cal.3d 1210, 1240 (*Pensinger* ), the Supreme Court affirmed a conviction for torture murder, finding that, unlike in *Steger,* where there

was a history of child abuse syndrome which gave rise to periodic explosions of violence, the defendant in *Pensinger* did not exhibit rage, demonstrated an awareness of the child's pain, and continued to methodically and intentionally inflict the pain over a considerable period of time. (*Ibid.*) The court concluded that the jury could infer a calculated and sadistic intent on the defendant's part to inflict pain to punish the child for crying. (*Ibid.*)

More recently, in *People v. Whisenhunt* (2008) 44 Cal.4th 174, 181, (*Whisenhunt* ), the Supreme Court affirmed the torture murder conviction of a defendant in the death of his live-in girlfriend's child. The evidence of the child's wounds included evidence that she had been brutally kicked or punched, and that, after she was incapacitated, the defendant "methodically poured hot cooking oil onto various portions of her body, repositioning her body so as to inflict numerous burns throughout her body, including her genital region." (*Id.* at p. 201.) The court concluded that "the condition of the body, with the numerous methodical burn wounds inflicted, abundantly supports the jury's finding that defendant had the willful, deliberate, and premeditated intent to cause extreme pain or suffering for a sadistic purpose." (*Ibid.*)

Finally, in *People v. Gonzales* (2012) 54 Cal.4th 1234, 1274 (*Gonzales* ), the Supreme Court found the evidence sufficient for the jury to have found that the defendant intentionally tortured and murdered his wife's niece. The evidence overwhelmingly demonstrated that the child was extensively tortured over a period of time. "Her injuries were such that an intent to inflict extreme and prolonged pain for a sadistic purpose was obvious. The inference that the torture began as an effort to discipline [the child] was reasonable, and defendant admitted that he was the spouse who mainly disciplined the children. He also admitted putting [the child] in the box in the closet, and wiring the hook above the box, to 'scare her.' Defendant further admitted running the bath water for [the child] the night she died, and helping [his wife] put her in the bath. The evidence showed that it took 15 minutes to fill the bathtub with water hot enough to inflict the burn that caused [the child's] death. Defendant could not have been unaware of the temperature, or the effect it would have on the child." (*Ibid.*) Moreover, the defendant did nothing to seek help for the child until rigor mortis was setting in. (*Ibid.*) All of these facts provided substantial evidence of torture murder. (*Ibid.*)

In the present case, the record contains substantial evidence demonstrating that appellant acted with the intent to inflict cruel and extreme pain and suffering on Jazzmin and J.D. (See § 206.) The evidence shows that appellant repeatedly beat J.D. and Jazzmin all over their bodies over many months with a variety of objects, including belts, spoons, knotted electrical cords, a closet rod labeled "B ASS Stick," and a padlock on a belt. Appellant also semi-suffocated them with plastic trash bags tightened around their heads and burned them with an iron on several occasions. Both children were severely malnourished, were tied up with a chain and padlock, were kept out of school, and had spent days or weeks at a time locked in a small closet. Jazzmin also was hit in the head with a carpet tack strip and kept naked toward the end of her life.

The evidence of appellant's intent to inflict extreme pain is further demonstrated by appellant's conduct on the day of Jazzmin's death. That day, appellant began beating Jazzmin for allegedly tampering with the thermostat. During the beating, she instructed J.D. to get trash bags and hot water. She then complained that the water

was not hot enough, although J.D. had felt it and it was hot. Appellant threw the hot water on Jazzmin, wrapped her in a blanket, and had her stand in one trash bag while appellant put the other trash bag over her head, before beating her some more.

The evidence further shows that, when appellant realized that Jazzmin had died, she became upset and panicked, but primarily was concerned for herself. She took the time, with her mother's help, to clean blood off the walls and carpet, to hide bloody towels and objects, and to change her clothes and put on makeup, even as Jazzmin lay dead on the floor for two hours, as rigor mortis set in.

In addition to the intent to inflict cruel and extreme pain and suffering on the twins, there is substantial evidence that appellant inflicted the injuries on these two children for the purpose of revenge, persuasion, or sadism. (See § 206.) Whether described as being inflicted to get revenge against the twins for real or imagined misbehavior, to attempt to persuade them to behave better, for her own sadistic satisfaction, or for all three purposes, appellant's heinous acts against these children satisfy the purpose requirement of section 206. Just a few specific examples of evidence establishing the requisite intent and purpose under section 206 include appellant's comment that she was burning the twins with an iron to do to them what they had done to her clothes, removing the light from the closet she kept them locked inside of after complaining that they were using her "PG & E," beating Jazzmin for failing to properly do her chores after an earlier beating left her nearly unable to walk, and getting upset when Jazzmin eventually stopped crying and reacting to the beatings.

In sum, there plainly was substantial evidence that, when she physically harmed Jazzmin and J.D., appellant intended to cause them extreme pain and suffering for purposes of either revenge, persuasion, a sadistic purpose, or all three. (See § 206; cf. *Gonzales, supra,* 54 Cal.4th at p. 1274; *Whisenhunt, supra,* 44 Cal.4th at p. 201; *Mincey, supra,* 2 Cal.4th at pp. 435–436; *Pensinger, supra,* 52 Cal.3d at p. 1240.)

Appellant nonetheless argues that, unlike other cases involving the killing of children by their caretakers, in which the Supreme Court affirmed convictions for torture murder, the evidence here of her mental illness and low intelligence negated the requisite criminal intent for torture.

Although the evidence was uncontroverted that appellant suffered from severe mental illness and had low-average intelligence, this does not undermine our conclusion, as discussed, *ante,* that substantial evidence supports the jury's finding that appellant acted with the intent necessary for a torture conviction. (See *Mincey, supra,* 2 Cal.4th at pp. 435–436 [diagnosis of intermittent explosive disorder and below average intelligence did not negate intent required for torture murder conviction].) The jury, moreover, was instructed on the need to find that appellant acted with the requisite specific intent before it could convict her of torture. (CALJIC Nos. 3.31, 9.90). The jurors were also instructed with CALJIC No. 3.32, which allowed them to consider evidence of mental disease, defect, or disorder in determining whether appellant had in fact formed the specific intents required for conviction of both torture and torture murder. [FN 8]

[FN 8] The court instructed the jury with CALJIC No. 3.32, as follows: "You have received evidence regarding a mental disease, mental defect, or mental disorder of the defendant at the time of the commission of the crimes charged

> in Counts One, Two and Four, or the lesser included offenses to those crimes.
> You should consider this evidence solely for the purpose of determining
> whether the defendant actually formed the required specific intent,
> premeditated and deliberated, or harbored malice aforethought, to the extent
> those are the elements of the offenses."

In light of the instructions given and the substantial evidence of the required culpable intent, appellant's mental illness and intellectual limitations do not warrant reversal of her torture convictions.

*Davis*, 2014 WL 3353242, at *13–18.

### ii.    Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324. The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam); *id.* at 655 (court of appeals "unduly impinged on the jury's role as factfinder" and failed to apply deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find evidence insufficient to support petitioner's conviction). A federal court collaterally reviewing a state court conviction does not decide whether it personally believes that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992); *see, e.g.*, *Coleman*, 566 U.S. at 656 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation. *Jackson*, 443 U.S. at 324.

If confronted by a record that supports conflicting inferences, a federal habeas court "must

23

presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court may not substitute its judgment for that of the jury. *See Coleman*, 566 U.S. at 657 (court of appeals erred in finding no reasonable basis for jury's conclusion that petitioner had specific intent to kill victim and force was used simply because there was no testimony describing physical action by petitioner). Indeed, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (court of appeals erred by substituting its judgment for that of California jury as to which side's expert witnesses more persuasively explained cause of death)). Under *Jackson*'s standard of review, a jury's credibility determinations are entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Coleman*, 566 U.S. at 651. To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964–65 (9th Cir. 2011).

### iii. Analysis

Applying these legal principles to Petitioner's allegations, the state court's rejection of Petitioner's claim did not involve an unreasonable application of the *Jackson* sufficiency standard to the facts of the case. *See Coleman*, 566 U.S. at 651.

Petitioner relies on two state cases to argue that the state court unreasonably determined

that a rational jury could have found that there was sufficient evidence that she inflicted pain for the required "purpose of revenge, extortion, persuasion, or for any sadistic purpose." Pet. at 26–27. In *People v. Steger*, the California Supreme Court reduced the defendant's first-degree murder by torture conviction to second-degree murder, holding that there was "not one shred of evidence to support a finding that [defendant severely beat her stepchild] with cold-blooded intent to inflict extreme and prolonged pain." 16 Cal. 3d 539, 548 (1976). Rather, the court found that "defendant [was] a tormented woman" and the "beatings were a misguided, irrational and totally unjustifiable attempt at discipline; but they were not in a criminal sense wilful, deliberate, or premeditated." *Id.* Likewise, in *People v. Walkey*, the California Court of Appeal reduced a first-degree murder by torture conviction to second-degree murder because the evidence of "explosive violence" towards the toddler victim was insufficient to establish that the defendant had a "wilful, deliberate and premeditated intent to inflict extreme and prolonged pain." 177 Cal. App. 3d 268, 275 (Ct. App. 1986).

But these cases do not establish that the state court acted unreasonably when it found the evidence sufficient to affirm Petitioner's conviction. First, as the state court recognized, *Steger* and *Walkey* were both murder-by-torture cases, a crime which, unlike so-called "simple" torture, requires proof of willfulness, deliberation, and premeditation. *See Davis*, 2014 WL 3353242, at *15 n.7; *compare* Cal. Penal Code § 189 (degrees of murder) *with* § 206 (torture). Second, the state court relied on newer and more factually analogous cases to conclude that "there plainly was substantial evidence that, when [Petitioner] physically harmed Jazzmin and J.D., [Petitioner] intended to cause them extreme pain and suffering for purposes of either revenge, persuasion, a sadistic purpose, or all three." *Davis*, 2014 WL 3353242, at *17 (citing *Gonzales*, 54 Cal. 4th at 1274; *Whisenhunt*, 44 Cal. 4th at 201; *Mincey*, 2 Cal. 4th at 435–436; *Pensinger*, 52 Cal. 3d at 1240). Contrary to Petitioner's suggestion, a conviction for torture does not require "sadistic purpose," Pet. at 29, but may also be based on the defendant acting for the purpose of "revenge, extortion, [or] persuasion." *See* Cal. Penal Code § 206. For example, in *People v. Gonzales*, the California Supreme Court upheld the defendant's torture murder conviction where the defendant "extensively tortured" the child he was supposed to be caring for in what "began as an effort to

25

discipline" the child. 54 Cal. 4th at 1274. Similarly, in *People v. Pensinger*, the California Supreme Court upheld the defendant's torture murder conviction where the defendant "was aware of [the victim's] pain but continued to inflict it intentionally over a considerable period." 2 Cal. 3d at 1240. Like the defendants in *Gonzales* and *Pensinger*, Petitioner extensively tortured Jazzmin over a long period of time by beating her "for allegedly tampering with the thermostat," ordering J.D. to "get trash bags and hot water," throwing the hot water on Jazzmin (after complaining that it was not hot enough), and placing the trash bag over Jazzmin's head. *See* Davis, 2014 WL 3353242, at *17. The state court did not unreasonably apply the constitutional sufficiency standard when it found that *Pensinger* and *Gonzales* were more analogous to the facts of Petitioner's case than the "misguided" or "explosive violence" present in *Steger* and *Walkey*. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### B. Insufficient Evidence for Murder

Petitioner contends that for "similar reasons as those explained" in her challenge to the torture convictions, the murder conviction must be vacated because there was insufficient evidence of torture. *See* Pet. at 31.

#### i. State Court Rejection of Claim

The state court rejected Petitioner's claim as follows:

Appellant contends her conviction of first degree murder was not supported by substantial evidence and violated due process.

Under section 189, "[a]ll murder which is perpetrated by means of[, inter alia,] torture, or by any other kind of willful, deliberate, and premeditated killing ... is murder of the first degree." The California Supreme Court has held that murder by means of torture pursuant to section 189 "is murder committed with a willful, deliberate and premeditated intent to inflict extreme and prolonged pain." (*Steger, supra,* 16 Cal.3d at p. 546.) "A defendant need not have any intent to kill to be convicted of this crime [citation], but he or she must have the defined intent to inflict pain." (*Ibid.*) In determining whether a murder was committed with the requisite intent, the jury may consider all of the circumstances surrounding the killing, including "the severity of the victim's wounds." (*Ibid.*)

In this case, the evidence of appellant's brutal, continuous, and almost routinized infliction of harm on Jazzmin—as already discussed with respect to the torture conviction (see Pt. I. & fn. 7, *ante* )—is more consistent with "planning and a preconceived design to inflict cruel pain and suffering" on her (*Mincey, supra,* 2 Cal.4th at p. 435) than with a number of distinct and uncontrolled " 'explosions of violence.' " (*Steger, supra,* 16 Cal.3d at pp. 548–549.) We therefore conclude there is

substantial evidence that, when she killed Jazzmin, appellant acted with "a willful, deliberate and premeditated intent to inflict extreme and prolonged pain," for purposes of torture murder under section 189. (*Steger*, at p. 546; see also *Gonzales, supra*, 54 Cal.4th at p. 1274; *Whisenhunt, supra*, 44 Cal.4th at p. 201; *Mincey*, at p. 436; *Pensinger, supra*, 52 Cal.3d 1210, 1240.) [FN 9]

> [FN 9] The prosecutor also relied on the theory of felony-murder to argue that appellant was guilty of first degree murder, with the underlying felony being the torture of Jazzmin. (See § 189.) Given our finding that substantial evidence supported the jury's torture conviction (see Pt. I, *ante*), she was properly convicted of first degree murder under the felony-murder theory as well. (See *People v. Bryant* (2013) 56 Cal.4th 959, 965 ["'Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony'"]; see also CALJIC No. 8.74 [jury must agree unanimously on degree of murder, but is not required to agree unanimously on theory of guilt].).

*Davis*, 2014 WL 3353242, at *18.

### ii.     Analysis

The legal standard for Petitioner's second ground for relief is the same as her first, so the Court need not repeat it here. For the same reasons as explained in its analysis of the challenge to the torture convictions, the Court finds that the state court did not unreasonably apply Supreme Court precedent when it found the evidence sufficient to support its conclusion that Petitioner's "brutal, continuous, and almost routinized infliction of harm on Jazzmin" constituted a "willful, deliberate and premeditated intent to inflict extreme and prolonged pain" so as to constitute torture murder. *See Davis*, 2014 WL 3353242, at *18. In addition, the state court's finding of sufficient evidence to sustain a conviction of torture combined with Jazzmin's death leads to the inescapable conclusion that Petitioner was also guilty of first-degree murder under a felony murder theory. *See People v. Bryant*, 56 Cal. 4th 959, 965 (2013) ("Under the felony-murder doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed. If the felony is listed in section 189, the murder is of the first degree . . . ."); Cal. Penal Code § 189 (listing torture as predicate felony for first-degree murder).

Mindful of the "sharply limited nature of constitutional sufficiency review" and applying the "additional layer of deference" required by AEDPA, this Court finds that the California court's rejection of this claim was not objectively unreasonable. *See Juan H.*, 408 F.3d at 1274–75; *see*

*also Jackson*, 443 U.S. at 319, 326. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### C. Unconstitutionally Vague Term in Torture Statute

Petitioner asserts that she is entitled to federal habeas relief because the phrase "for any sadistic purpose," as used in the state torture statute, is unconstitutionally vague based on the principles set forth in *Johnson v. United States*, 135 S. Ct. 2551 (2015). Petitioner did not present her vagueness claim to the state court initially, because *Johnson* had not yet been decided. Petitioner did, however, file a petition for a writ of habeas corpus in the California Supreme Court, which was denied without comment on September 14, 2016. *See* Pet. Exh. C. Under Section 2254(d), the Court reviews this denial without comment as a state court adjudication on the merits. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011) (holding that California Supreme Court's one-sentence summary order denying petition constituted adjudication on the merits because Section "2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'"). Before turning to the merits, the Court must first determine whether the new claim is timely.

#### i. Timeliness of Claim

As a preliminary matter, Respondent contends that Petitioner's vagueness claim is time-barred because she first raised this claim in a state habeas corpus petition, 17 days after the one-year federal limitations period had expired. *See* Ans. at 34. Respondent concedes that the initial federal petition was timely filed, but points out that it did not include a vagueness challenge. *See id.* Petitioner replies that the claim relates back to the original filing, because it "challenges the same statutes" as did the insufficiency claims. Trav. at 6.

Under AEDPA, a state prisoner must file her petition for a writ of habeas corpus in federal court within a one-year limitations period. 28 U.S.C. § 2244(d)(1). This limitations period "run[s] from the latest of" several dates, including "(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." *Id.* The Supreme Court has clarified that similar language in 28 U.S.C. Section 2255 (applicable to federal

prisoners) means that the one-year limitation period begins to run when the new right is recognized by the Supreme Court, not when it is made retroactive. *See Dodd v. United States*, 545 U.S. 353, 357 (2005). This rule "make[s] it possible for the limitations period to expire before the cause of action accrues." *Id.* at 360 (quotation omitted). But the federal statute of limitations is tolled when a "properly filed application" for state post-conviction relief is pending. 28 U.S.C. § 2244(d)(2).

The Supreme Court issued its decision in *Johnson* on June 26, 2015, *see* 135 S. Ct. at 2551, which is when Petitioner's one-year clock began ticking. But Petitioner did not first present her *Johnson*-based claim until she filed a petition for a writ of habeas corpus in the California Supreme Court on July 13, 2016, *see* Pet. Exh. C—meaning that the one-year statute of limitations had already expired. And once the federal statute of limitations has run, a newly filed state petition does not reset the clock. *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003); *see also Larsen v. Soto*, 742 F.3d 1083, 1088 (9th Cir. 2013) (recognizing *Ferguson* rule but applying actual innocence exception). Thus, because Petitioner first raised her *Johnson* vagueness claim more than one year after the right was initially recognized, her claim is facially untimely under AEDPA.

However, under the Federal Rules of Civil Procedure, "pleading amendments relate back to the date of the original pleading when the claim asserted in the amended plea 'arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.'" *Mayle v. Felix*, 545 U.S. 644, 656 (2005) (quoting Fed. R. Civ. P. 15(c)(1)(B)). In the habeas context, an amended petition relates back when the "original and amended petitions state claims that are tied to a common core of operative facts." *Id.* at 664. Conversely, an amended petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 661–62 (quotation omitted).

Here, there is "but one episode-in-suit." *Mayle*, 545 U.S. at 660. Petitioner's original federal petition contended that the facts of her abuse of Jazzmin and J.D. were insufficient to support her convictions for torture and torture murder, given what she viewed as the

misapplication of California case law. *See* Dkt. No. 1. Her instant petition contends that conflicting California cases, applied to the facts of her abuse of Jazzmin and J.D., render the torture and torture murder statutes unconstitutionally vague. *See* Pet. at 32–34. Thus, Petitioner's vagueness claim relates back because, like the original claims, it is tied to the common core of facts surrounding her abuse of Jazzmin and J.D. and how they are applied under California law. *Cf. Hebner v. McGrath*, 543 F.3d 1133, 1138 (9th Cir. 2008) (finding no relation back under *Mayle* where "original claim related to the evidence admitted at trial, while his later claim was directed at the jury instructions given by the trial court"). Because Petitioner's new claim relates back and is not time-barred under AEDPA, the Court must adjudicate it on the merits.

### ii. Vagueness

A state criminal statute may be challenged as unconstitutionally vague by way of a petition for a writ of habeas corpus by a prisoner convicted under the statute. *See Vlasak v. Sup. Ct. of Cal.*, 329 F.3d 683, 688–90 (9th Cir. 2003). A statute may be unconstitutional "on its face" or "as applied." A successful challenge to the facial constitutionality of a statute invalidates the statute itself, whereas a successful as-applied challenge does not render the statute itself invalid but only the particular application of the statute. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). At issue here is a facial challenge pursuant to which "a statute is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013) (internal quotations omitted).

In *Johnson v. United States*, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA") was unconstitutionally vague under the Fifth Amendment due process clause. 135 S. Ct. at 2557. The residual clause provided that a prior conviction constituted a violent felony if it "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The Court noted that "the failure of persistent efforts . . . to establish a standard can provide evidence of vagueness." *Johnson*, 135 S. Ct. at 2558 (alteration in original, quotation omitted). The following year, the Court held that *Johnson* was a substantive decision and thus had retroactive effect in cases on collateral review.

30

*Welch v. United States*, 136 S. Ct. 1257, 1265 (2016).

Petitioner contends that "*Johnson*'s holding applies equally to California's torture and torture murder statutes" because parents have a privilege to discipline their children and courts have applied the term "for any sadistic purpose" inconsistently. Pet. at 32–34.

The California torture statute provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury . . . upon the person of another, is guilty of torture." Cal. Penal Code § 206. First, *Johnson*'s holding—which concerned judicial determinations under the federal ACCA—does not apply to the California torture statute, except for its general principle that criminal statutes will be invalidated if they are unconstitutionally vague. And such a general principle cannot provide a basis for habeas relief. *See Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) ("if the circumstances of a case are only 'similar to' [Supreme Court] precedents, then the state court's decision is not 'contrary to' the holdings in those cases"). Second, although a parent is privileged to *reasonably discipline* a child, *People v. Whitehurst*, 9 Cal. App. 4th 1045, 1050 (1992), the Court has no trouble concluding that the line between reasonable discipline and torture is not so vague that it gives rise to a constitutional violation. *See Mincey*, 2 Cal. 4th at 434 (affirming torture murder conviction and noting that "a misguided attempt at discipline can involve an intent to cause cruel pain and suffering"); *People v. Clark*, 201 Cal. App. 4th 235, 251 (2011) (affirming conviction for felony child abuse after jury instructed on parental discipline privilege); *Whitehurst*, 9 Cal. App. 4th at 1050 (explaining that "corporal punishment is unjustifiable when it is not warranted by the circumstances, i.e., not necessary, or when such punishment, although warranted, was excessive"). Third, as discussed *supra*, contrary to Petitioner's suggestion, Pet. at 34, courts have not treated the statutory language inconsistently but have drawn distinctions when presented with different facts.

Accordingly, Petitioner has not shown that Section 206 is unconstitutional, or that the state court's rejection of this claim was contrary to or an unreasonable application of federal law, or that it involved an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

### D. Refusal to Instruct Jury on Voluntary Manslaughter

Petitioner contends that the state court unreasonably applied federal law by affirming the trial court's "failure to instruct on voluntary manslaughter based upon provocation or imperfect self-defense." Pet. at 34.[2]

### i. State Court Rejection of Claim

The state court rejected Petitioner's claim as follows:

Appellant contends the trial court's refusal to instruct on voluntary manslaughter as a lesser included offense of murder violated her constitutional rights to a jury trial and due process. In particular, she asserts that the trial court erred when it refused to instruct the jury on either heat of passion or imperfect self-defense and imperfect defense of another as theories of voluntary manslaughter. [FN 10]

> [FN 10] In her opening brief, appellant also claimed the court erred when it failed to instruct on voluntary manslaughter based on commission of an assaultive felony, relying on *People v. Garcia* (2008) 162 Cal.App.4th 18. In her reply brief, however, she observes that, in the recent case of *People v. Bryant, supra,* 56 Cal.4th at page 970, our Supreme Court disapproved of *People v. Garcia,* holding that a killing in the commission of an inherently dangerous assaultive felony cannot be voluntary manslaughter "because voluntary manslaughter requires either an intent to kill or a conscious disregard for life." (*Bryant,* at p. 970.) Appellant therefore acknowledges that the trial court was not obligated to instruct on that theory.

During appellant's trial, defense counsel asked the trial court to instruct on attempted voluntary manslaughter under the theories of heat of passion and imperfect self-defense. The court agreed with the prosecutor that there was not substantial evidence to warrant giving an instruction under either of these theories. [FN 11]

> [FN 11] The court did instruct the jury on involuntary manslaughter based on the commission of an unlawful act not amounting to a felony, i.e., battery (§ 242) and misdemeanor child abuse (§ 273a, subd. (b)). (See CALJIC No. 8.45.)

" ' "Murder is the unlawful killing of a human being with malice aforethought. [Citation.] A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of ... voluntary manslaughter. [Citation.]" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills lacks malice ... in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' [citation], or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations]." [Citation.]' " (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)

---

[2] In her headings, Petitioner refers to the trial court's refusal to instruct on *involuntary* manslaughter, but the text of her argument makes clear that she means *voluntary* manslaughter. *See* Pet. at 34; Trav. at 7.

The trial court is required to instruct on all theories of a lesser included offense, such as voluntary manslaughter, that find substantial evidentiary support, but " 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense.... [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could ... conclude[ ]' " that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.]" (*Moye, supra,* 47 Cal.4th at p. 553; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 162.) "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*Breverman,* at pp. 162–163.)

**A. *Heat of Passion***

"Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted (*Beltran* ).)

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citations.]' [Citation.] '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [¶] To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] ... ' "However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter...." [Citation.]' [Citation.]" (*Moye, supra,* 47 Cal.4th at pp. 549–550.)

Finally, a defendant's individual circumstances do not affect the objective component of heat of passion. As our Supreme Court explained in *People v. Steele* (2002) 27 Cal.4th 1230, 1253: "Defendant's evidence that he was intoxicated, that he suffered various mental deficiencies, that he had a psychological dysfunction due to traumatic experiences in the Vietnam War, and that he just 'snapped' when he heard the helicopter, may have satisfied the subjective element of heat of passion. [Citations.] But it does not satisfy the objective, reasonable person requirement, which requires provocation by the victim. [Citation.] 'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' [Citation.] '[E]vidence of defendant's extraordinary character and environmental deficiencies was manifestly irrelevant to the inquiry.' [Citation.]" (See also *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 ["Failing

the objective test, Padilla's hallucination cannot as a matter of law negate malice so as to mitigate murder to voluntary manslaughter—whether on a 'sudden quarrel or heat of passion' theory of statutory voluntary manslaughter"].)

In the present case, appellant argues that, regardless of her delusional beliefs, there was evidence that Jazzmin did some of the things of which appellant accused her, including ruining her own clothes, getting into various kinds of trouble at school, refusing to bathe despite the fact that she was menstruating and had intense body odor, urinating on things and telling appellant she did it so that the rest of the family would have to smell it, refusing to eat, and generally misbehaving to get back at appellant. According to appellant, Jazzmin's defiant behavior demonstrated that Jazzmin was indisputably "an extraordinarily difficult child who would have tried the patience of any parent" and whose conduct "would have provoked a reasonable parent to act rashly from passion rather than judgment." Appellant therefore asserts that, because her frustration was not solely the product of her mental illness, Jazzmin's provocation was sufficient to warrant a heat of passion instruction.

Even assuming there was substantial evidence that Jazzmin engaged in these behaviors described by appellant, Jazzmin's conduct plainly was not sufficiently provocative to satisfy the "ordinary person," objective component of the heat of passion theory of voluntary manslaughter. (See *Moye, supra,* 47 Cal.4th at p. 550.) Nor would this evidence support a finding that appellant killed Jazzmin "while under 'the actual influence of a strong passion' induced by such provocation," as is required to satisfy the subjective component. (*Ibid.*) Even if Jazzmin's problem behavior might have temporarily angered appellant, her relentless imprisonment, beating, and starvation of Jazzmin, over weeks and months, cannot possibly be said to have resulted from her reason being " ' "obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.]" (*Beltran, supra,* 56 Cal.4th at p. 942.)

The trial court did not err in refusing to instruct the jury on a heat of passion theory of voluntary manslaughter. (See *Beltran, supra,* 56 Cal.4th at p. 942; *Moye, supra,* 47 Cal.4th at pp. 549–550.)

### B. Unreasonable Self–Defense

"Unreasonable self-defense, also called imperfect self-defense, 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' [Citation.] A killing in imperfect self-defense constitutes, by definition, unreasonable conduct because the belief in the need to defend is not reasonable. The killing is nevertheless mitigated because of the defendant's misguided but good faith belief." (*Beltran, supra,* 56 Cal.4th at p. 951; accord, *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1261 [if the defendant "actually, but *unreasonably* believed in the need to defend him or herself from imminent death or great bodily injury, the theory of 'imperfect self defense' applies to negate malice"].)

Here, appellant argues that because the evidence shows that she had an actual fear of imminent harm from Jazzmin—whether delusional or not—the trial court should have instructed the jury on imperfect self-defense.

In *People v. Mejia–Lenares* (2006) 135 Cal.App.4th 1437, 1453 (*Mejia–Lenares* ),

the Fifth District Court of Appeal held that imperfect self-defense does not apply when the unreasonable belief is based on a delusion. The court explained that "imperfect self-defense remains a species of mistake of fact [citation]; as such, it cannot be founded on delusion. In our view, a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality." (*Ibid.,* fn. omitted.) We agree with the *Mejia–Lenares* ' court's conclusion that, "[a]s imperfect self-defense cannot be based on delusion alone, appellant was not entitled to have jurors instructed to consider evidence of [delusion] on the issue of whether appellant killed in the actual but unreasonable belief in the need to defend against imminent peril." (*Id.* at p. 1461.) [FN 12]

> [FN 12] The question of whether the doctrine of imperfect self-defense is available when the actual but unreasonable belief in the need for self-defense is based solely on a delusion is currently before our Supreme Court. (*People v. Elmore* (Oct. 27, 2010, B216917) [nonpub. opn.], review granted Nov. 30, 2010, S188238.)

In addition, even assuming both that imperfect self-defense can be based on a delusion alone and that there was substantial evidence that appellant actually feared, based on her delusion, that Jazzmin was a danger to her and J.T., the evidence did not show that appellant in fact acted under the delusional belief that she needed to protect herself or J.T. from *imminent* harm. Our Supreme Court has described this requirement of imminence: "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" ... [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.] Put simply, the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

We agree with respondent that, even assuming a delusion caused appellant to believe Jazzmin put poison in her and J.T.'s medicines and lotions, "it cannot be said that appellant confined Jazzmin in the ... closet for days on end, and ultimately starved Jazzmin to death over the course of months, in the belief of imminent harm." Also, the beating during which Jazzmin died was precipitated by appellant's claim that Jazzmin had tampered with the thermostat, which plainly could not have put either appellant or her daughter in danger of *imminent* harm. (See *In re Christian S., supra,* 7 Cal.4th at p. 783.)

Although it is not clear, appellant appears to be arguing that, even ignoring her delusional beliefs, the trial court should have instructed on imperfect self-defense or defense of another because there was substantial evidence that her "fears were not entirely delusional." Even more than the alleged delusions, however, appellant's other beliefs about Jazzmin's negative conduct (e.g., stretching out clothes and urinating and defecating on the floors of the house) clearly do not provide substantial evidence of an *actual* belief in *imminent* harm. [FN 13]

> [FN 13] This claim—that appellant believed she was in imminent danger of harm from Jazzmin based on Jazzmin's problematic conduct that was not a

product of appellant's delusions—is further undermined by evidence that Jazzmin was locked in the closet for most of the last weeks of her life, and therefore would not have had the opportunity to engage in even these lesser negative acts.

Appellant also asserts that some of her fears were not entirely delusional in that Jazzmin and J.D. had admitted to some of the bad behavior, including that they escaped from the closet at night and tampered with appellant and J.T.'s "personal products." The testimony of both J.D. and Jackie demonstrates, however, that these "admissions" were nothing more than the twins' attempts to avoid worse beatings by falsely admitting to appellant's allegations.

The trial court did not err in refusing to instruct the jury on an imperfect self-defense theory of voluntary manslaughter. (See *Beltran, supra,* 56 Cal.4th at p. 951; *In re Christian S., supra,* 7 Cal.4th at p. 783.)

*Davis*, 2014 WL 3353242, at *18–22.

### ii. Legal Standard

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). To be cognizable on federal habeas review, claimed error in omitting an instruction "must so infect[ ] the entire trial that the resulting conviction violated due process." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury." *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995). But a habeas petitioner whose claim involves the failure of a state court to give a particular instruction, as opposed to a claim that the court gave an incorrect instruction, bears an "especially heavy burden." *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). "In addition, a state trial court's finding that the evidence does not support a claim of imperfect self-defense is entitled to a presumption of correctness[.]" *Menendez*, 422 F.3d at 1029.

### iii. Analysis

On a preliminary note, to the extent that Petitioner argues that the state court misapplied state law to prejudicial effect, that claim is not cognizable on federal habeas. The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (internal quotation omitted). And the Ninth Circuit has held that this rule applies to the failure to provide requested jury instructions in a manner a

petitioner argues violated state law. *See, e.g.*, *Menendez*, 422 F.3d at 1029 ("Any error in [a] state court's determination of whether state law allowed for an instruction . . . cannot form the basis for federal habeas relief."); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (noting that "the failure of a state court to instruct on a lesser offense in a non-capital case fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding") (alteration and quotation omitted).

Perhaps aware of this barrier, Petitioner makes clearer in her Traverse her theory that "failure to instruct on heat of passion and imperfect self defense deprived her of her *federal* constitutional right to have the state prove that heat of passion and unreasonable belief in the need to defend herself was lacking beyond a reasonable doubt." *See* Trav. at 7 (emphasis added). And Petitioner contends that because the jury was instructed on malice murder (in addition to torture murder and felony murder), the Supreme Court's decision in *Mullaney v. Wilbur*, 421 U.S. 684 (1975), requires the government to prove malice beyond a reasonable doubt. *See* Trav. at 7.

But *Mullaney* does not support the weight Petitioner puts on it. *Mullaney* concerned a state rule that required a defendant charged with murder to prove that he acted in the heat of passion on sudden provocation. 421 U.S. at 703. In accord with the rule, the jury was instructed "that if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." *Id.* at 686. This rule violated due process. *Id.* at 703. The Court explained that it was intolerable that under this allocation of the burden of proof the defendant could receive a life sentence for murder "when the evidence indicates that it is as likely as not that he deserves a significantly lesser sentence." *Id.* at 703. Of key importance here is the Court's holding that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented* in a homicide case." *Id.* at 704 (emphasis added).

The state court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Mullaney*. Unlike the Maine rule at issue in *Mullaney*, California does not require the defendant to shoulder the burden of proof on the existence of provocation or heat of passion.

37

Unlike *Mullaney*, Petitioner's jury was not instructed that Petitioner had to prove that she acted in the heat of passion or that without such proof, malice aforethought would be conclusively implied from an intentional killing. Most importantly, *Mullaney* imposed the duty to prove the absence of heat of passion "when the issue is properly presented," 421 U.S. at 704, which it was in *Mullaney* because the defendant admitted to killing the victim and offered heat of passion as his defense. But here, the state court was not unreasonable in finding that the evidence at trial on these affirmative defenses was so lacking that the issue was not properly presented. As the state court noted, Petitioner's "relentless imprisonment, beating, and starvation of Jazzmin, over weeks and months cannot possibly be said to have resulted from her reason being obscured or disturbed by [heat of] passion." *See Davis*, 2014 WL 3353242, at *20 (internal quotation omitted). Likewise, the state court noted that the fatal beating "was precipitated by [Petitioner's] claim that Jazzmin had tampered with the thermostat," which could not support the imminent harm element of imperfect self-defense. *See id.* at *21.

Petitioner has not overcome the presumption of correctness and has not shown that any error would have so infected the entire trial that her conviction violated due process. *See Menendez*, 422 F.3d at 1029. Accordingly, Petitioner is not entitled to habeas relief on this claim.

**E.    Misstatement of Law**

Petitioner contends that by "misstat[ing] the elements and the law of torture" during closing argument, the prosecutor "lowered the state's burden of proof," thus rendering the trial fundamentally unfair in violation of her constitutional right to due process. *See* Pet. at 37.

**i.    State Court Rejection of Claim**

The state court rejected Petitioner's claim as follows:

Appellant contends the prosecutor committed misconduct by misstating the law during closing argument, in violation of her due process rights.

The California Supreme Court has explained that " ' " '[a] prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th

800, 819 (*Hill* ).) The defendant need not show that the prosecutor acted in bad faith. (*Id*. at p. 822.)

Our Supreme Court has further observed that " ' "a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] ..." ' [¶] Prosecutors, however, are held to an elevated standard of conduct ... because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation.]" (*Hill, supra*, 17 Cal.4th at pp. 819–820.)

In evaluating a claim of prosecutorial misconduct based on a prosecutor's comments to the jury, we must determine whether " ' there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner. [Citations.]' " (*People v. Valdez* (2004) 32 Cal.4th 73, 132–133; *People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another ground in *Hill, supra,* 17 Cal.4th at p. 823, fn. 1.)

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.] [¶] The foregoing, however, is only the general rule. A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' [Citations.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.]" (*Hill, supra,* 17 Cal.4th at pp. 820–821.)

In the present case, the prosecutor argued during closing argument that appellant "chose to take those actions [against Jazzmin and J.D.] for the purpose of punishing those children, persuading them which is one of the theories of torture. Persuasion, revenge. I'm going to do to you what you did to my clothes or any other sadistic purpose." During his rebuttal argument, the prosecutor further stated, "Punishment is a form of persuasion. It is persuading somebody to do something or not do something under threat of pain. You cannot punish someone without the threat of pain. And the statute, Penal Code [s]ection 206, torture, says it has to be for the purposes of revenge, persuasion, or for sadistic purpose. It does not have to be all three. And when you're trying to persuade these kids to do or not do something, using such means, that is persuasion."

Appellant argues that, through these comments, the prosecutor incorrectly informed the jury that "punishment constitutes persuasion and revenge under section 206," which was a misstatement of the law regarding the mental state requirement for torture, torture murder, and felony murder by torture. The prosecutor, therefore, according to appellant, committed prosecutorial misconduct, which violated her constitutional right to due process. (See *Hill, supra,* 17 Cal.4th at pp. 829–830 [it is misconduct for a prosecutor to misstate the law by attempting " 'to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all

elements' "].)

As a threshold matter, respondent asserts that appellant forfeited this claim due to her failure to object and request an admonition in the trial court. (See *Hill, supra,* 17 Cal.4th at p. 820.) Appellant responds that she did not forfeit the issue because an admonition would not have cured the harm caused by the prosecutor's misstatements. (See *ibid.*) We agree with respondent that appellant's failure to object and request an admonition in the trial court forfeits the issue on appeal. Assuming the prosecutor did misstate the law, had defense counsel objected, the trial court could have admonished the jury and corrected the misstatement. (Cf. *People v. Morales* (2001) 25 Cal.4th 34, 47 [presuming jury relied on court's instructions, not arguments of counsel, in convicting defendant].)

Moreover, even were we to consider appellant's claim on the merits (see *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"] ), we would nevertheless reject it. That is because the prosecutor did not misstate the law when he said appellant's purpose in punishing the twins was to persuade or take revenge on them. (See § 206.)

As explained in part I., *ante,* of this opinion, a caretaker's punishment of a child *can,* in certain circumstances, constitute revenge, persuasion, or a sadistic purpose for purposes of torture under section 206. (See, e.g., *Mincey, supra,* 2 Cal.4th at p. 436 [jury could find defendant's beatings of girlfriend's child "were committed with the intent to cause cruel pain and suffering for a sadistic purpose"]; *Pensinger, supra,* 52 Cal.3d at p. 1240, [jury could infer a calculated and sadistic intent on defendant's part to inflict pain to punish child for crying].) Here, there was substantial evidence that appellant's "punishment" of Jazzmin and J.D. constituted torture, i.e., that she inflicted great bodily injury on these two children with the intent to cause them extreme pain or suffering for one or more of the following purposes: revenge, persuasion, or sadism. (See § 206; see also Pt. I., *ante*.)

Accordingly, the prosecutor's challenged comments during closing argument were not misstatements of law, and appellant cannot demonstrate prosecutorial misconduct.

*Davis*, 2014 WL 3353242, at *22–23.

### ii. Legal Standard

Prosecutorial misconduct is cognizable in federal habeas corpus; "the appropriate standard of review for such a claim . . . is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (noting that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

Regarding statements made during closing argument, under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct "infected the trial with unfairness." *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided by "examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted).

### iii.    Analysis

Respondent argues that this claim is procedurally defaulted, because Petitioner failed to object to the supposedly improper remarks at trial. *See* Ans. at 40. The Court agrees.

The state appellate court found that this claim was forfeited because Petitioner neither objected at trial nor requested an admonition. *Davis*, 2014 WL 3353242, at *23. Generally, a federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and that is adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). The procedural default rule is a specific instance of the more general "adequate and independent state grounds" doctrine. *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994). The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) ("Federal habeas claims must be dismissed where state courts have decided the claim on state procedural grounds."). Procedural default, however, can be overcome if a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Petitioner asserts, in cursory fashion, that she "can establish cause and prejudice for any failure to object" (and also seemingly raises a claim for ineffective assistance of counsel), Pet. at 39, but makes no attempt to explain with any particularity how she has met the standard to overcome procedural default. Review of these claims is therefore barred by independent and

adequate state grounds.

Nevertheless, Petitioner's claim would also fail on the merits. Petitioner contends that the prosecutor committed misconduct by arguing to the jury that punishment could constitute persuasion or revenge under the California torture statute, thus misstating the law and wiping away the privilege parents hold to discipline their children. *See* Pet. at 37–38. To the extent that Petitioner contests the state court's interpretation of state law, that is not reviewable here. *See Estelle*, 502 U.S. at 67–68. And, considering the vast evidence of Petitioner's brutal and unrelenting imprisonment, beating, and starvation of Jazzmin and J.D., any misstatements would not have infected the trial with so much unfairness as to constitute a denial of due process.

The Court thus finds that even if this claim were not procedurally defaulted, the state court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the entire trial record.

Accordingly, Petitioner is not entitled to habeas relief on her prosecutorial misconduct claim.

**F.    Sanity Finding Violated Due Process**

Petitioner contends that she is entitled to habeas relief because "no rational trier of fact could have disregarded compelling evidence" of her insanity, thus violating her constitutional right to due process.

**i.    State Court Rejection of Claim**

The state court rejected Petitioner's claim as follows:

Appellant contends the jury's sanity finding violated due process.

Section 25, subdivision (b), provides in relevant part: "In any criminal proceeding ... in which a plea of not guilty by reason of insanity is entered, the defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." Despite the conjunctive language in section 25, our Supreme Court has interpreted subdivision (b) "as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity might be returned. [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 170; accord, *People v. Skinner* (1985) 39 Cal.3d 765, 769 (*Skinner* ).) A defendant who is incapable of

understanding that his or her act is morally wrong may not be found sane merely because he or she knows the act is unlawful. (*Skinner*, at p. 783.) In addition, people operating under a delusion could theoretically be considered insane "since, because of their delusion, they do not know or understand the nature of their act or, if they do, they do not know that it is wrong." (*Mejia–Lenares, supra,* 135 Cal.App.4th at p. 1456.)

In the present case, appellant argues in essence that the opinions of the defense experts who found her legally insane are more valid than those of the court-appointed experts who found her sane. On appeal, however, we do not reweigh the evidence of competing expert opinions, as appellant would have us do. Instead, we must determine only whether there is substantial evidence in the record to support the jury's finding of sanity or, more precisely, "whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it." (*People v. Drew* (1978) 22 Cal.3d 333, 350, 351 (*Drew* ), superseded by statute on another ground in *Skinner, supra,* 39 Cal.3d at pp. 768–769.) Indeed, in *Drew,* our Supreme Court affirmed a sanity verdict even though both court-appointed psychiatrists had testified that the defendant was unaware of the wrongfulness of his assault. (*Drew,* at p. 350 ["we have frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion"].)

While all of the experts in this case agreed that appellant was mentally ill, that fact does not inevitably mean she was legally insane when she tortured Jazzmin and J.D. and murdered Jazzmin. The two defense experts, Dr. Franklin and Dr. Blinder, opined that appellant was insane. Dr. Franklin believed that appellant was operating under a delusional belief system that Jazzmin was doing things to harm her and J.T., which prevented her from knowing either the nature and quality of her acts or that those acts were morally wrong. Dr. Franklin believed that appellant was an "organized psychotic" who dissociated while disciplining the twins such that she lost herself in her actions and did not remember exactly what she was doing. Dr. Franklin further believed that appellant thought that what she was doing was not morally wrong because she was defending herself and her family and trying to save Jazzmin. Dr. Blinder similarly believed that appellant's delusional thinking caused her to misinterpret Jazzmin's conduct and that her delusions, combined with her high level of stress, caused her to dissociate at the time of the offenses.

The two court-appointed experts, Dr. Griffith and Dr. Good, opined, on the contrary, that appellant was sane when she committed the offenses. Dr. Griffith believed that appellant suffered from delusional disorder, but also believed she was subconsciously exaggerating her psychotic symptoms. He believed appellant was sane when she committed her offenses based on the clear statements she made after her arrest, in which she took responsibility for her actions and acknowledged that her punishment of the twins, which she detailed, was abusive. That she also concealed the extent of the abuse contributed to his opinion that she understood that what she was doing was both legally and morally wrong. Moreover, even if appellant's conduct was a result of delusions, Dr. Griffith believed she nonetheless understood both the nature and quality and the moral wrongfulness of her actions.

Dr. Good had not diagnosed appellant with delusional disorder but, even if she suffered from such a disorder, he still believed she knew the nature and quality of her actions and understood that what she was doing was wrong. This belief was supported

United States District Court
Northern District of California

by the fact that the abuse occurred over many months, and Dr. Good found it hard "to believe that in each and every one of the instances of abuse or torture that she did not know, at least at some point, that what she was doing was wrong." In addition, like Dr. Griffith, Dr. Good believed that appellant's ongoing attempts to keep the extent of her abuse and the twins' injuries from others, including her mother, the social worker, a neighbor, and even members of the household, demonstrated that "she still retained a sense that this was wrong." In addition, Dr. Good believed that appellant's ability to understand and respond to questions in a cogent way after her arrest, along with her apparent lack of psychosis, contributed to his opinion of sanity.

We conclude that the expert testimony of Dr. Griffith and Dr. Good provided substantial evidence that, when she committed the offenses here, appellant was not operating under a delusion that kept her from knowing or understanding the nature of her acts or knowing that what she did was wrong. (See *Mejia–Lenares, supra,* 135 Cal.App.4th at p. 1456.) Though the opinions of Dr. Franklin and Dr. Blinder were contrary to those of the other two experts, appellant has not shown that their testimony and conclusions were "of such weight and character that the jury could not reasonably reject [them]." (*Drew, supra,* 22 Cal.3d at p. 351.) [FN 14]

> [FN 14] Appellant relies on *People v. Duckett* (1984) 162 Cal.App.3d 1115, 1119, in which the three psychiatrists who testified unanimously believed that the defendant, who suffered from chronic paranoid schizophrenia, could neither substantially appreciate the criminality of his conduct nor conform that conduct to the law's requirements. In reversing the jury's sanity finding, Division Three of this District determined that "there were no circumstances present that would have permitted the jury to reject the expert opinion" that the defendant was insane. (*Id.* at p. 1123.) Here, unlike in *Duckett,* there was conflicting evidence regarding appellant's sanity, with two experts concluding she was insane and two other experts concluding she was sane at the time of the offenses. It was for the jury to evaluate the testimony of the experts, as well as the bases for their opinions, along with the other evidence presented, and make the sanity determination. As we have found, substantial evidence supports the jury's determination that appellant was sane when she committed the offenses.

The jury's sanity finding did not violate due process.

*Davis*, 2014 WL 3353242, at *23–25.

### ii.    Analysis

The legal standard for Petitioner's sixth ground for relief is the same as her first and second, so the Court need not repeat it here. Applying the required two layers of judicial deference, the Court is confident that the state court did not unreasonably apply *Jackson* to the facts of the case. *See Coleman*, 566 U.S. at 651.

Petitioner essentially asks the Court, on habeas review, to credit the opinions of the two defense experts over the two court-appointed experts. *See* Pet. at 41–46. But this Court is limited

to determining whether the state court unreasonably applied federal law, under which it must "presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *See Jackson*, 443 U.S. at 326. As the state court noted, although Petitioner's two experts opined that she was insane when she committed the offenses, two court-appointed experts opined that she was sane. *See Davis*, 2014 WL 3353242, at *25. And, of course, the jury was not limited to merely weighing the opinions of these four experts but was expected to assess all of the evidence before it. *See People v. Drew*, 22 Cal. 3d 333, 350 (1978) (noting that the California Supreme Court has "frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion"), superseded by statute on other grounds as recognized in *People v. Skinner*, 39 Cal. 3d 768, 769 (1985). Considering the "sharply limited nature of constitutional sufficiency review" and applying the "additional layer of deference" required by AEDPA, this Court finds that the California court's rejection of Petitioner's sufficiency claim related to her sanity was not objectively unreasonable. *Juan H.*, 408 F.3d at 1274–75; *see also Jackson*, 443 U.S. at 319, 326. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### G. Unconstitutional Sentence

Last, Petitioner contends that, given her "severe mental illness," her sentence of thirty-two years to life, which she deems "effective life without parole," violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See* Pet. at 46.

#### i. State Court Rejection of Claim

The state court rejected Petitioner's claim as follows:

Appellant contends her total sentence of 32 years to life in prison was effectively a life-without-parole sentence, which, in light of her serious mental illness, constituted cruel and unusual punishment under the federal and state Constitutions. [FN 15]

> [FN 15] Appellant objected on Eighth Amendment grounds in the trial court, but the court rejected her claim.

The Eighth Amendment to the United States Constitution mandates that " '[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' [Citation.] 'The Eighth Amendment, which forbids cruel and unusual punishments, contains a "narrow proportionality principle" that "applies to noncapital sentences." ' [Citation.] The appropriate standard for determining whether a particular sentence for a term of years violates the Eighth

45

Amendment is gross disproportionality." (*People v. Em* (2009) 171 Cal.App.4th 964, 976–977 (*Em* ), citing *Ewing v. California* (2003) 538 U.S. 11, 20; *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (conc. opn. of Kennedy, J.).)

"Article I, section 17 of the California Constitution prohibits infliction of '[c]ruel and unusual punishment.' A sentence may violate this prohibition if ' "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' [Citation.] ... [¶] [The defendant] must overcome a 'considerable burden' to show the sentence is disproportionate to his level of culpability. [Citation.] Therefore, '[f]indings of disproportionality have occurred with exquisite rarity in the case law.' [Citation.]" (*Em, supra,* 171 Cal.App.4th at p. 972; see *In re Lynch* (1972) 8 Cal.3d 410, 425–427, superseded by statute on other grounds as stated in *People v. West* (1999) 70 Cal.App.4th 248, 256 [discussing factors to be used in determining whether a particular punishment is disproportionate]; see also *People v. Dillon* (1983) 34 Cal.3d 441, 448.)

" 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' [Citation.]" (*Em, supra,* 171 Cal.App.4th at p. 971.)

Here, in arguing that her prison term of 32 years to life violates the state and federal prohibitions against cruel and unusual punishment, appellant notes that she was 41 years old at the time of sentencing and will not be eligible for parole until she turns 73. She cites an actuarial table that suggests her life expectancy is 68.3 years and claims that her sentence is effectively life without the possibility of parole (LWOP). Because she was mentally ill when she committed her offenses, she argues that this effective LWOP term was unconstitutional.

Respondent does not dispute that appellant is unlikely to be eligible for parole during her lifetime, but asserts that nothing in the law supports her argument, which "amounts to little more than an assertion that a defendant who suffers from mental illness should always be eligible for parole before her expected death."

Appellant relies on a series of opinions, in which the United States Supreme Court found that certain sentences for juvenile and mentally retarded defendants violated the Eighth Amendment, due to the reduced moral culpability of such defendants. (See *Atkins v. Virginia* (2002) 536 U.S. 304, 318 (*Atkins* ) [death sentences for "mentally retarded" offenders, defined as individuals with "not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18"]; see also *Roper v. Simmons* (2005) 543 U.S. 551, 575 (*Roper* ) [death sentences for juvenile offenders]; *Graham v. Florida* (2010) 560 U.S. 48, 82 (*Graham* ) [LWOP sentence for juvenile nonhomicide offenders]; [FN 16] *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 2463, 2469] (*Miller* ) [sentences amounting to functional equivalent of LWOP in juvenile nonhomicide cases, and mandatory LWOP sentences in juvenile homicide cases].)

> [FN 16] In *People v. Caballero* 55 Cal.4th 262, 268, our Supreme Court concluded, consistent with *Graham*, that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment."

In these cases, the Supreme Court described the characteristics that set juveniles and mentally retarded adults apart from other offenders, in terms of moral culpability and appropriate punishment. For example, "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments. [Citation.] As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.]" (*Graham, supra,* 560 U.S. at p. 68, quoting *Roper, supra,* 543 U.S. at pp. 569–570, 573.)

Likewise, because of their impairments, mentally retarded adults "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." (*Atkins, supra,* 536 U.S. at p. 318, fns. omitted.)

We do not believe that the reasoning of these Supreme Court cases is applicable to the present situation. Appellant is a middle-aged adult who received a non-LWOP sentence, albeit one that may be for longer than her life expectancy, for, inter alia, first degree murder involving the prolonged torture, of a dependent child. [FN 17] Hence, her situation is not comparable to juveniles who are sentenced to LWOP or a term of years amounting to LWOP for nonhomicide offenses (*Miller, supra,* 560 U.S. ___ [132 S.Ct. at p. 2463]; *Graham, supra,* 560 U.S. at p. 82); juveniles who are sentenced either to death or mandatory LWOP for homicides offenses (*Miller,* at p. 2469; *Roper, supra,* 543 U.S. at p. 575); or mentally retarded adults who are sentenced to death. (*Atkins, supra,* 536 U.S. at p. 318.)

> [FN 17] Although the evidence shows that appellant is severely mentally ill and has low-average intelligence, the jury found that she inflicted great bodily injury on Jazzmin and J.D. with the specific intent to cause them cruel or extreme pain and suffering. (§ 206.) In convicting appellant of torture and first degree murder, the jury rejected the argument that she had no intent to commit torture and that she was unaware of the harm she was inflicting. Moreover, the jury found appellant sane at the time of the offenses.

Instead, we believe that appellant's situation is governed by two recent California Supreme Court cases involving similar claims by mentally ill capital defendants. In *People v. Castaneda* (2011) 51 Cal.4th 1292, 1344 (*Castaneda* ), the defendant contended that imposition of the death penalty on an offender who suffered from "mental and emotional deficits that developed during his childhood," and which " 'impaired his ability to perceive right from wrong, contributed to impulsive behavior, and substantially diminished his culpability for the crime,' " constituted cruel and

unusual punishment. Our Supreme Court rejected the defendant's claim, distinguishing *Atkins* and *Roper* and finding that he had failed to demonstrate that his mental condition—antisocial personality disorder—was "analogous to mental retardation or juvenile status for purposes of imposition of the death penalty." (*Castaneda,* at p. 1345.)

More recently, in *People v. Hajek* (2014) 58 Cal.4th 1144 (*Hajek* ), our Supreme Court revisited the question of whether sentencing a mentally ill defendant to death constitutes cruel and unusual punishment. There, the defendant had introduced expert testimony that he suffered from cyclothymic disorder, bipolar disorder, and borderline personality disorder with antisocial traits, which impaired his judgment and prevented him from forming the requisite mental state for the charged offenses. (*Id.* at p. 1166.) The court rejected the defendant's claim that the underlying rationales of *Atkins* applied to severely mentally ill offenders, observing both that the defendant had not cited any controlling federal authority barring imposition of the death penalty on mentally ill offenders and that it had previously found *Atkins* inapplicable under California law in *Castaneda*. (*Id.* at p. 1251.)

As the *Hajek* court explained: "Our analysis rejecting the defendant's claim in *Castaneda* applies with similar force to *Hajek's* claim. Most significantly, the circumstance that an individual committed murder while suffering from a serious mental illness that impaired his judgment, rationality, and impulse control does not necessarily mean he is not morally responsible for the killing. There are a number of different conditions recognized as mental illnesses, and the degree and manner of impairment in a particular individual is often the subject of expert dispute. Thus, while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn. Thus, we are not prepared to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence. We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty." (*Hajek, supra,* 58 Cal.4th at p. 1252.)

The reasoning and holdings of our Supreme Court in *Hajek* and *Castaneda* apply here, and appellant's claim that her severe mental illness and low average intelligence render her categorically ineligible for an effective LWOP sentence cannot succeed.

Appellant also briefly argues that her sentence is grossly disproportionate to her individual moral culpability, given that it was her severe mental illness coupled with what she describes as the twins' "severe psychological and behavioral problems" that caused the abuse. (See *Em, supra,* 171 Cal.App.4th at pp. 972, 976–977.) We disagree.

Appellant acknowledges that, at sentencing, the court stated that the jury's assessment of her moral culpability was dispositive as to this claim. She nonetheless avers that the prosecutor's misstatement of law regarding "punishment" and torture, as well as the court's refusal to instruct on voluntary manslaughter, negate that statement. As we have found, however, the prosecutor's comments during closing argument were not misconduct; nor did the court err when it refused to instruct the jury on two theories of voluntary manslaughter. (See Pts. III. & IV., *ante.*)

48

> This case arose from one of the most horrific instances imaginable of the continuous torment of two children. That appellant was severely mentally ill when she committed the offenses does not so lessen her moral culpability as to warrant a finding that this is "among those 'exquisitely rare' cases which merit reversal on traditional disproportionality review." (*People v. Perez* (2013) 214 Cal.App.4th 49, 60.)

*Davis*, 2014 WL 3353242, at *25–28.

### ii.    Legal Standard

The Eighth Amendment to the United States Constitution provides there "shall not be . . . cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)); *see also Crosby v. Schwartz*, 678 F.3d 784, 795 (9th Cir. 2012) ("Circumstances satisfying the gross disproportionality principle are rare and extreme, and constitutional violations on that ground are 'only for the extraordinary case.'") (citing *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003)). In addition to disproportionality challenges, a sentence may be challenged for categorical reasons. *See Graham v. Florida*, 560 U.S. 48, 60–61 (2010). For instance, the Supreme Court has held that imposing the death penalty on intellectually disabled individuals categorically violates the Eighth Amendment. *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002).[3]

### iii.   Analysis

Petitioner argues that her "undisputed low IQ and undisputed 'severe mental illness'" made her sentence "grossly disproportionate to her individual moral culpability." Pet. at 48. But Petitioner has not cited a single established precedent from the Supreme Court supporting her position. Nor could she. None of the categorical bans announced by the Supreme Court apply to Petitioner—who was an adult, found sane by the jury, without an intellectual disability, and not sentenced to life without parole. *See Davis*, 2014 WL 3353242, at *27. And Petitioner has not pointed to any Supreme Court cases supporting her view that her sentence is so grossly

---

[3] At the time *Atkins* was decided, the condition at issue was known as "mental retardation," but the U.S. Supreme Court clarified that it would use the term "intellectual disability" going forward. *Hall v. Florida*, 572 U.S. 701, 704 (2014). This Court will do the same, except in quotations.

disproportionate as to be the "extraordinary case" that runs afoul of the Eighth Amendment. *See Lockyer*, 538 U.S. at 77. The Court of Appeal's rejection of Petitioner's Eighth Amendment claim was not contrary to or an unreasonable application of Supreme Court precedent. Petitioner is not entitled to habeas relief on this claim.

**H.  Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

**V.  CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is **DENIED**, and a certificate of appealability is **DENIED**.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  2/22/2019

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge